**BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, SOUTHERN PAC. LINES IN TEXAS AND LOUISIANA, et al. v. TEXAS & N. O. R. CO. et al.**

District Court, S. D. Texas. February 6, 1928.

No. 314.

**1. Injunction ⬅230(1)—Error in issuing injunction is no defense to contempt proceeding for disobedience.**

A person proceeded against in a contempt case for disobeying injunction cannot set up as a defense that court erred in issuing it, since errors must be corrected by appeal, and not by disobedience.

**2. Contempt ⬅21—Respondent in contempt case may question order only in so far as void.**

Respondent in contempt case may question order which he is charged with refusing to obey only in so far as he can show it to be absolutely void.

**3. Master and servant ⬅16—Law providing for representatives to settle disputes between railroads and employees held valid (Railway Labor Act, § 2, par. 3 [45 USCA § 152]).**

Railway Labor Act, § 2, par. 3 (45 USCA § 152), providing for designation of representatives by railroads and employees for purpose of settling labor disputes without interference, influence, or coercion exercised by either party over self-organization or designation of representatives by the other, *held* valid.

**4. Master and servant ⬅16—Law providing for representatives to settle disputes between railroad and employees must be liberally construed (Railway Labor Act, § 2, par. 3 [45 USCA § 152]).**

Railway Labor Act, § 2, par. 3 (45 USCA § 152), providing for selection of representatives by railroad and employees for purpose of settling labor disputes without interference, influence, or coercion by either party, must be liberally construed and applied, so as to give effect to paramount public convenience subserved thereby.

**5. Injunction ⬅223(1)—Railroad, promoting organization of employees' association hostile to organized labor unions and recognizing it as representative of employees, held to have violated injunction restraining it from violating law providing for selection of representatives in labor disputes (Railway Labor Act, § 2, par. 3 [45 USCA § 152]).**

Railroad, promoting organization of employees' association hostile to organized labor unions and recognizing it as representative of employees, *held* to have violated injunction restraining it from violating Railway Labor Act, § 2, par. 3 (45 USCA § 152), providing for selection of representatives for settlement of labor disputes without interference, influence, or coercion.

In Equity. Contempt proceeding by the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, Southern Pacific Lines in Texas and Louisiana, and others, against the Texas & New Orleans Railroad Company and others. Order in accordance with opinion.

Fulbright, Crooker & Freeman, of Houston, Tex. (C. G. Stearns and J. H. Crooker, both of Houston, Tex., of counsel), for plaintiffs.

Baker, Botts, Parker & Garwood, of Houston, Tex. (J. H. Tallichet and Calvin Garwood, both of Houston, Tex., of counsel), for defendants.

HUTCHESON, District Judge. This is a contempt proceeding, brought against the Texas & New Orleans Railroad Company and certain of its officials, upon information that they have violated a temporary injunction issued by this court on August 3, 1927, restraining the defendant, its servants and

agents, from violating the third paragraph of section 2 of the Railway Labor Act (44 Stat. 577 [45 USCA § 152]). That section provides:

"Representatives, for the purposes of this act, shall be designated by the respective parties in such manner as may be provided in their corporate organization, or unincorporated association, or by other means of collective action, without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other."

The terms of the injunction, entered after a full hearing, followed closely the language of the act. At that hearing the company did not assert the invalidity of the act. It merely denied that it had infringed it.[1]

At this hearing, however, the defendants, while defending mainly on the ground that they had not violated the order, also raised by suggestion the question of the power of Congress to so legislate, citing Coppage v. Kansas, 236 U. S. 1, 35 S. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C, 960, and Adair v. United States, 208 U. S. 161, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764.

[1, 2] It is fundamental that "a person proceeded against" in a contempt case "for disobeying an injunction can never set up as a defense that the court erred in issuing it. * * * Errors must be corrected by appeal, and not by disobedience." Brougham v. Oceanic Steam Navigation Co. (C. C. A.) 205 F. 857. And "that a respondent in a contempt case may question the order which he is charged with refusing to obey only in so far as he can show it to be absolutely void." 6 R. C. L. 505; O'Brien v. People, 216 Ill. 354, 75 N. E. 108, 108 Am. St. Rep. 219, 3 Ann. Cas. 966; People v. McWeeney, 259 Ill. 161, 102 N. E. 233, Ann. Cas. 1916B, 36; Toledo Scale Co. v. Computing Scale Co., 261 U. S. 399, 43 S. Ct. 458, 67 L. Ed. 719; Barnes v. Chicago, 232 Ill. 403, 83 N. E. 932, 14 L. R. A. (N. S.) 1150, 122 Am. St. Rep. 129.

In view, however, of the long-continued, persistent, and at times bitterly rancorous assertion that noncontractual relations of employer and employee do not present justiciable matters, that injunctions in labor disputes are political and not judicial, and that a proceeding of this kind is not the exercise of judicial power, but merely an essay in usurped and tyrannical "government by injunction," it seems desirable to here briefly set down the reasons which support the conclusions of the preliminary opinion that Congress had full authority to make justiciable a controversy of this kind.[2]

For the purposes of this opinion it may be roughly stated that all justiciable matters are made so by law derived from two sources, that ascertained and declared by the judges as founded in and springing from the customs of the people, and that enacted by the Legislatures; or, again roughly, common law and statutory law. Statutory law may be either declaratory or in derogation of the common law. In the former case, it makes more clear or gives more sanction to established customs. In the latter, while it may in rare cases run counter to established custom, it usually is declaratory of customs which, though existent as such, have not yet become established as law, so as to make actions in defiance of them justiciable.

Customs, then, being the basis and spring of the law, changing as they must with changed conditions, judges and Legislatures from time to time, in declaring the law, will make innovations upon it, and new adaptations of it to conform to these changes; and so, slowly through judicial decisions, and often with great rapidity through legislative

---

[1] Its counsel said: "If it should appear that the corporation is coercing its employees, I would not be disposed seriously to contest that the court would have a right to enjoin it under the terms of the United States Labor Board Act of May 20, 1926."

The court in its opinion said: "That question simply here is whether, under the act passed for the purpose of settling disputes between carriers and their employees, which act parties to this litigation seem to have, as far as the record shows, acted upon and adopted, Congress can do what it has done to insure that in the settlement of these disputes each side shall be represented by those of its own selection. uninfluenced by the action of the other. In short, Congress, recognizing that a primary requisite of the settlement of a dispute is the truly representative character of those who bring it about, has determined, and I think has legally declared, conditions under which these relations, if they are maintained, and these disputes, if they are adjusted, are to be adjusted."

[2] "Speaking generally, it may be observed that the judicial power of a nation extends to all controversies justiciable in their nature, the parties to which or the property involved in which may be reached by judicial process, and when the judicial power of the United States was vested in the Supreme and other courts; all the judicial power which the nation was capable of exercising was vested in those tribunals, and unless there be some limitations expressed in the Constitution it must be held to embrace all controversies of a justiciable nature arising within the territorial limits of the nation, no matter who may be the parties thereto." Kansas v. Colorado, 206 U. S. 83, 27 S. Ct. 661, 51 L. Ed. 956.

action, the law modifies and grows, and, growing, lives.

Innovations in the case of judge-made law, the growth of new categories for justiciable matters, again roughly come by two processes: First, the slow interstitial process referred to by Mr. Justice Holmes;[3] and, second, the more rapid one of disapproving and overruling principles, either erroneous when announced, or become erroneous through changing customs, referred to by Mr. Justice Brandeis.[4]

It has been said that decisions go by established categories, and that if, for a particular state of facts, no existing legal category may be found, the matter is not justiciable. Such statement, when taken in the light of the history of the law and in recognition of the indubitable fact that the living principle of modification and growth inheres in it, is sound, for legal categories are in this meaning constantly rearranging themselves to admit the newly established customs, which through their articulation by courts and legislatures have become law.

Such being the origins of the law, it is plain that, in the absence of some limitation upon it, whatever a particular court or Legislature might think to be the custom could be declared to be the law, and laws might change with uncomfortable rapidity.

Against this danger two stabilizing influences, maintaining equilibrium and preserving old customs until outgrown, are constantly opposed. In the courts, it is that of stare decisis; in the Legislatures, it is that of the Fifth and Fourteenth Amendments, which so operate. These amendments, providing as they do for the preservation of due process —that is, established custom—prevent arbitrary and unreasonable departures from established law, and are constantly being invoked in judicial controversies, where it is maintained that statutes, national and state, have sought to make justiciable matters which by reason of their prohibitions cannot be made so.

One school of thinkers has maintained, and for a while with apparent success, that the custom guaranteed by these amendments is fixed and static, and not subject, like other phases of the law, to change and growth.[5] Another school, declaring that a true decision depends as well upon induction as upon deduction, has declared, in the language of Mr. Justice Holmes: "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics." Lochner v. New York, 198 U. S. 75, 25 S. Ct. 546, 49 L. Ed. 937, 3 Ann. Cas. 1133.[6]

---

[3] "I recognize without hesitation that judges do, and must legislate, but they can do so only interstitially: they are confined from molar to molecular motions. A common-law judge could not say: I think the doctrine of consideration a bit of historical nonsense, and shall not enforce it in my court. No more could a judge exercising the limited jurisdiction of admiralty say: I think well of the common-law rules of master and servant, and propose to introduce them here en bloc." Southern Pacific v. Jensen, 244 U. S. 221, 37 S. Ct. 531, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900.

[4] "Such limitation of principles previously announced, and such express disapproval of dicta, are often necessary. It is an unavoidable incident of the search by courts of last resort for the true rule. The process of inclusion and exclusion, so often applied in developing a rule, cannot end with its first enunciation. The rule as announced must be deemed tentative. For the many and varying facts to which it will be applied cannot be foreseen. Modification implies growth. It is the life of the law. If the court is of opinion that this act of Congress is in necessary conflict with its recent decisions, those cases should be frankly overruled." Washington v. Dawson, 264 U. S. 219, 44 S. Ct. 302, 68 L. Ed. 646.

"Stare decisis is ordinarily a wise rule of action. But it is not a universal, inexorable command. The instances in which the court has disregarded its admonition are many." Id., 264 U. S. 238, 44 S. Ct. 309, 68 L. Ed. 646.

[5] The Business of the Supreme Court, Frankfurter and Landis, c. 8, 307 to 318.

[6] "General propositions do not decide concrete cases. The decision will depend on a judgment or intuition more subtle than any articulate major premise. * * * Every opinion tends to become a law. I think that the word 'liberty,' in the Fourteenth Amendment, is perverted when it is held to prevent the natural outcome of a dominant opinion, unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law." Lochner v. New York, 198 U. S. 76, 25 S. Ct. 547, 49 L. Ed. 937, 3 Ann. Cas. 1137.

"It may not be amiss, in the present case, before examining the constitutional question, to notice the course of legislation, as well as expressions of opinion from other than judicial sources. * * * Constitutional questions, it is true, are not settled by even a consensus of present public opinion, for it is the peculiar value of a written constitution that it places in unchanging form limitations upon legislative action, and thus gives a permanence and stability to popular government which otherwise would be lacking. At the same time, when a question of fact is debated and debatable, and the extent to which a special constitutional limitation goes is affected by the truth in respect to that fact, a widespread and long continued belief concerning it is worthy of consideration. We take judicial cognizance of all matters of general knowledge." Muller v. Oregon, 208 U. S. 419, 28 S. Ct. 325, 52 L. Ed. 551, 13 Ann. Cas. 957.

While in Euclid Valley v. Ambler, 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, Mr. Justice Sutherland, for the court, declares: "Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. * * * And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are possibly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise." [7]

When, therefore, on either side of a dispute between an employer engaged in interstate commerce, a recognized subject of federal legislation, and its employees, one asserts, in the face of a statute which puts conditions upon its exercise, that that particular form of liberty, the liberty of contract, the right of the employer to hire and fire, and of the employee to serve or quit, in the absence of contract (the most stubbornly asserted of all the particular liberties), is unrestrainable, he must be prepared, not only to give learned dissertations on the freedom of contract, but to show in the light of established practices employed in the course of this long controversy, and of the judicial and legislative pronouncements on it, that it has not behind it a sufficient force of general public opinion to create an established custom which may be articulated into law.

If, in a study of the matter, a student of the law, employing in his research induction and deduction, should upon examination find that, rising at first slowly, and then, through the full realization of a common plight, a common cause and a common remedy (the achievement of group solidarity and power through unionization), rushing on tides of feeling, the demand for collective bargaining became a passion with workingmen,

and that, begun more than a half century ago, this demand has been asserted and opposed with equal fierceness, and at the cost not only of the blood and treasure of the combatants, but of disturbances of the public peace and prosperity, and that for the greater part of this time this asserted right of collective bargaining has been enjoyed, he would be an ignorant man indeed who would not at once conclude that such a pregnant struggle could not have been so long waged without giving birth to customs, both capable of and in the interest of the public peace, requiring judicature.

He would not have been surprised to find the history of the origin, growth, and change of such customs replete with legislative and judicial pronouncements. He would find that, beginning more than 40 years ago, six times has Congress legislated directly upon the subject;[8] that in cases without number the courts have issued their injunctions declaring and vindicating judicial power to protect the commerce of the country from the anarchy and disruption arising out of these fierce labor disputes.[9]

He would find that in Adair v. U. S., 208 U. S. 167, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764, a majority of the Supreme Court of the United States had not been able to see that the custom of balancing the concentrated power of the employer, on the one hand, by the concentrated power of the employee, on the other, in negotiating wage and working agreements, which custom the Congress sought in the interest of the preservation of the even flow of commerce and the public peace to bring out of the field of mere custom into that of law, had so established itself as to become justiciable.

---

[7] "The truth seems to me to be that, subject to compensation when compensation is due, the Legislature may forbid or restrict any business when it has a sufficient force of public opinion behind it. Lotteries were thought useful adjuncts of the state a century or so ago; now they are believed to be immoral and they have been stopped. Wine has been thought good for man from the time of the Apostles until recent years. But when public opinion changed it did not need the Eighteenth Amendment, notwithstanding the Fourteenth, to enable a state to say that the business should end." Tyson & Bro. v. Banton, 273 U. S. 446, 47 S. Ct. 434, 71 L. Ed. 718.

[8] Act Oct. 1, 1888 (25 Stat. 501), creating a board or commission for settling controversies and differences between railroads and other common carriers engaged in interstate commerce and their employees; the Erdman Act of June 1, 1898 (30 Stat. 424), nullified in part in Adair v. U. S., 208 U. S. 167, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764; the Act of July 15, 1913 (38 Stat. 103) for the arbitration of disputes between carriers engaged in interstate commerce and their employees; the act of September 3, 5, 1916, the Adamson Act (Comp. St. §§ 8680a–8680d); Act Feb. 28, 1920, Railway Labor Board Act (41 Stat. 469); the Railway Labor Act of May 20, 1926 (44 Stat. 577 [45 USCA §§ 151 to 163]).

[9] Arising out of the stress and strain of the conflict of 1894, resulting in the disruption of commerce bordering on civil war, came In re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1092, in which, in ringing words, the Supreme Court declared the power of the courts to protect the commerce of the country without resort to arms.

But he would also find that others of the judges, dissenting, could not see how the "liberty through sheer antipathy" to bring on a struggle which would disrupt commerce could be paramount to public interest and he could but wonder at least if this were not so.[10]

So wondering, he would not be surprised to find that, when, through the assertion of "liberty exercised in sheer antipathy," the United States, for want of compulsorily arbitral measures, was stood up and forced to deliver, and Congress, responding to the crisis, on September 3, 1916, enacted the Adamson Act, fixing the eight-hour standard, the Supreme Court of the United States, in an opinion unanswerable in its logic and noble in its assertion of power, settled for all time the full power of the Congress, either directly or by instrumentalities provided by it for compulsory arbitration, to settle disputes to prevent strikes and the disruption of commerce.[11]

Following after and founded upon these pronouncements, establishing the justiciable character of controversies between employer and employed which tend to interrupt and affect commerce, custom, legislation, and judicial decision not only furnish the precedent for the principle of the act, but disclose the very mischief which the act was designed to prevent, and provide for it the very language in which its direction is couched.

And first came the war, with railroads under federal control centered in Washington; the centralization of control in the United States as employer, matched by centralization of control in powerful labor organizations as employees, with resulting national agreements governing wages and working conditions. This condition made inevitable the passage by Congress in 1920 of the Railway Labor Board Act for the settling of disputes between railroads and their employees, which it was foreseen would arise in the unscrambling process required in the return to private operation. The board established rules and made decisions in many labor disputes.

---

[10] Justice McKenna, after declaring that the facts of history should not be overlooked, nor the course of legislation, said:

"How can controversies, which may seriously interrupt or threaten to interrupt the business of carriers * * * be averted or composed, if the carrier can bring on the conflict or prevent its amicable settlement by the exercise of mere whim and caprice? I say mere whim or caprice, for this is the liberty which is attempted to be vindicated as the constitutional right of the carriers. * * * Liberty is an attractive theme, but the liberty which is exercised in sheer antipathy does not plead strongly for recognition." Adair v. United States, 208 U. S. 186, 28 S. Ct. 285, 52 L. Ed. 436, 13 Ann. Cas. 764.

"What did Congress mean? Had it no purpose? Was it moved by no cause? Was its legislation mere wantonness and an aimless meddling with the commerce of the country? These questions may find their answers in In re Debs, 158 U. S. 564 [15 S. Ct. 900, 39 L. Ed. 1092]." Id., page 187 [28 S. Ct. 285].

"A provision of law which will prevent or tend to prevent the stoppage of every wheel in every car of an entire railroad system certainly has as direct influence on interstate commerce as the way in which one car may be coupled to another, or the rule of liability for personal injuries to an employee." Id., page 189 [28 S. Ct. 286].

[11] "We are of opinion that the reasons stated conclusively established that, from the point of view of inherent power, the act which is before us was clearly within the legislative power of Congress to adopt, and that in substance and effect it amounted to an exertion of its authority, under the circumstances disclosed, to compulsorily arbitrate the dispute between the parties by establishing as to the subject matter of that dispute a legislative standard of wages operative and binding as a matter of law upon the parties—a power none the less efficaciously exerted because exercised by direct legisla-

tive act, instead of by the enactment of other and appropriate means providing for the bringing about of such result. If it be conceded that the power to enact the statute was in effect the exercise of the right to fix wages where by reason of the dispute there had been a failure to fix by agreement, it would simply serve to show the nature and character of the regulation essential to protect the public right and safeguard the movement of interstate commerce, not involving any denial of the authority to adopt it." Wilson v. New, 243 U. S. 351, 37 S. Ct. 303, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024.

"The capacity to exercise the private right free from legislative interference affords no ground for saying that legislative power does not exist to protect the public interest from the injury resulting from a failure to exercise the private right." Id., page 353 [37 S. Ct. 304].

We are "of the opinion that Congress had the power to adopt the act in question, whether it be viewed as a direct fixing of wages to meet the absence of a standard on that subject resulting from the dispute between the parties, or as the exertion by Congress of the power which it undoubtedly possessed to provide by appropriate legislation for compulsory arbitration." Id., page 359 [37 S. Ct. 306].

In his dissent Mr. Justice McReynolds said: "Considering the doctrine now affirmed by a majority of the court as established, it follows as of course that Congress has power to fix a maximum as well as a minimum wage for trainmen, to require compulsory arbitration of labor disputes which may seriously and directly jeopardize the movement of interstate traffic, and to take measures effectively to protect the free flow of such commerce against any combination, whether of operatives, owners, or strangers." Id., page 388 [37 S. Ct. 314].

In its Decision No. 119 it laid down 16 principles, of which 2 are applicable here.[12] In Decision No. 218, wherein the Pennsylvania Railroad was seeking to control the designation of representatives, the Labor Board sharply denied this right.[13] Decision No. 220 involved a contention of that railroad that individuals, and not labor organizations, should be designated as representatives. This contention was denied.[14]

Dissatisfied with these rulings, the Pennsylvania Railroad appealed from them, attacking both the constitutionality of the act creating the board and the correctness of its decisions. On both points the board was sustained.[15]

---

[12] "The right of employees to be consulted prior to a decision of the management adversely affecting their wages or working conditions shall be agreed to by management. This right of participation shall be deemed adequately complied with if and when the representatives of a majority of the employees of each of the several classes directly affected shall have conferred with the management."

"The majority of any craft or class of employees shall have the right to determine what organization shall represent members of such craft or class. Such organization shall have the right to make an agreement which shall apply to all employees in such craft or class. No such agreement shall infringe, however, upon the right of employees not members of the organization representing the majority to present grievances either in person or by representatives of their own choice."

[13] "The carrier had no more right to undertake to assume control of the selection of the representatives of the employees than the employees would have had to supervise the naming of the representatives of the carrier, for the statute plainly provides that the employees shall designate and authorize their representatives. In this sophisticated land of popular elections, no political party would submit to having its primary held and managed by the opposing party."

[14] "The statute recognizes the existence of organizations of railway employees, and the right of the men to belong to such organizations is no longer seriously questioned in any quarter. * * * It is unjust and unreasonable to seek by methods, direct or indirect, to deprive them of the efficient representation afforded by these organizations, provided, of course, a majority of them desire to be so represented."

[15] "It is said that the Federation is a labor union affiliated with the American Federation of Labor, and that the phrase 'organization of employees,' used in the act, was not intended by Congress to include labor unions. We find nothing in the act to impose any such limitation, if the organization in other respects fulfills the description of the act. Congress has frequently recognized the legality of labor unions (United Mine Workers v. Coronado Coal Co., 259 U. S. 344 [42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762]), and no reason suggests

In the course of the opinion the Chief Justice gives expression to the thought which informs as to the prime purpose of the section of the act under discussion here, saying: "Again, we think that this question of who may be representatives of employees, not only before the board, but in the conferences and elsewhere, is and always has been one of the most important of the rules and working conditions in the operation of a railroad." Pa. R. R. v. Labor Board, 261 U. S. 83, 43 S. Ct. 282, 67 L. Ed. 536.

It is not at all surprising, then, that when the Labor Board was abolished by the Railway Labor Act of May 20, 1926, in the third clause here under discussion, Congress, in the light of the experience of the past, has embodied the principle of natural justice that representatives of employees, in order to prevent disputes, which was the declared purpose of the act, should be truly representative.

[3, 4] Nor can there longer be any doubt that Congress had the power to, and that it must, in the interest of public peace and safety, make certain, in the first step in negotiations between the railroad employer and employee (who have long since come to be recognized, as to this instrument of interstate commerce in their hands, not as private persons having the right to exercise "liberty through sheer antipathy," but as trustees of the public), that representatives of the railroad companies should not meet representatives of the employees, nominally elected by them, but in fact under the influence and control of the railroad companies. I therefore easily find that the legislation in question was not only within the power of Congress to enact, but that it should be liberally construed and applied, so as to give effect to the paramount public convenience subserved by it.

[5] Nor do I think it more debatable that both the letter and the spirit of the statute and of the injunction have been violated. While it is hard to believe that a railroad and its officials would deliberately seek to set at naught both the legislative and the judicial power of the United States, it is difficult to avoid the conclusion that the violation of the statute and of the injunction which followed its violation, was the result of a strong and settled purpose to defy both, and that that spirit of heady violence to obtain its ends, which has so often exhibited itself in these

itself why such an association, if its membership is properly inclusive, may not be regarded as among the organizations of employees referred to in this legislation." Pennsylvania R. Co. v. Labor Board, 261 U. S. 72, 43 S. Ct. 278, 67 L. Ed. 536.

labor disputes, in the conduct of employees when the injunction was the other way, is not absent here.

Nor is it possible to reconcile the claim of the defendant railroad, that it is not seeking to influence or interfere in the selection of representatives, with the record made in this case of motives, purpose, and activity. This is no new devising. It must be borne in mind that this is old straw twice unsuccessfully threshed out before the Labor Board, to oust from the position of representation, obtained during federal control, this Brotherhood.[16]

This present flare-up had its seat in that old fire, and there is about its present fierce and steady flame an appearance of purpose and of resolution firmly conceived to again assert the liberty of "mere whim or caprice," that "liberty which is exercised in sheer antipathy, and which therefore does not plead strongly for recognition," which is wholly inconsistent with the claim of the defendant of neutrality between these rival associations here put forth.[17]

Many affidavits were submitted on the hearing for the injunction which abundantly established that the activity of the officers and agents of the railroad company in securing authorizations was inspired by the company, while the record teems with evidence that the Association was the favored child of the defendant company, and, if not created, was largely sponsored, promoted, and maintained by it. The evidences of activity in violation of the statute, and of the injunction occurring since, are more numerous, cogent, and powerful. ·

Not only did the railroad company, with a sheer and gratuitous wantonness of spirit, reject the offices of the Board of Mediation, created and operating under this same act, before whom, at the time of the filing of this suit, a wage dispute initiated by the Brotherhood was pending,[18] but before the ink was hardly dry upon the order of injunction proceeded to nullify it by recognizing as truly representative the Association, all of whose authorizations had been filed with· the defendant Torian before this suit was filed, and the most of which had been obtained, as found by the court, by the use of means in violation of the statute. And this recognition was accorded, and action taken under it, in the face of the statute,[19] and of Torian's af-

---

[16] On November 14, 1923, after the Brotherhood had been twice sustained as against the Association of Clerical Employees, the defendant Torian, for the company, wrote Harper as follows:

"November 14, 1923.

"At conference yesterday, I advised that the carrier would comply with Decision 1971 of the United States Labor Board, and recognize the organization of the Brotherhood of Railway and Steamship Clerks until such time as the majority of the clerical employees, by secret ballot, select other representation."

[17] In Torian's affidavit, filing in this cause· on July 29, 1927, it is stated: "Said Texas & New Orleans Railroad Company has never recognized the Brotherhood as the representative of its clerical employees, save and except as required to do so by decisions of the United States Railroad Labor Board, and it is not, and has never been, the purpose or intent of the said railroad company or its predecessors in the ownership or control of the properties now operated by the railroad company, to recognize or deal with said Brotherhood, except as required to do so by the decisions aforesaid. The Brotherhood has at all times been ex-·tremely radical in its attitude, and has made and presented many unreasonable demands on the railroad company, and while its officers have conducted themselves,·and still conduct themselves, as acutely hostile to the interests of the railroad company, the railroad company has not undertaken to cause the formation of the Association, and has never interfered with, influenced, or coerced, or attempted to interfere with, influence, or coerce, the clerical employees with respect to membership in either the Brotherhood or the Association. Many of the officers and employees of the railroad company,· and particularly the officers and employees the work of whose de-

partments or stations is most directly affected by loyalty, industry, and interest in the welfare of the company on the part of clerical employees, have a strong interest in the selection by said employees of an organization to represent them which will endeavor to co-operate with their employer, and to deserve, rather than demand without deserving, favorable action in the matter of wages and working conditions."

[18] G. S. Waid, by telegram of August 2, requested the Board of Mediation to relinquish jurisdiction. This request, by telegram of August 4, the board declined, and on August 4 Waid telegraphed the board as follows: "Brotherhood of Railway and Steamship Clerks does not represent a majority of our clerical employees, and we will have no further dealing with them. We are satisfied can make amicable adjustment with Association of Clerical Employees Southern Pacific Lines which does represent majority of clerical employees, and it is the opinion of our counsel, after careful consideration of the law, that there is nothing in the law or in our present situation which can or should prevent us from reaching agreement with organization last mentioned. *The inference in. your telegram that we can deal only with the· Brotherhood seems to us and our counsel to be .obstructive, rather than helpful.*" And there-·after its offices were ignored and its tender of continuing services of September 28 to A. D. McDonald, president, and of October 11 to H. M. Lull, vice president, were declined.

[19] Section 6 of the act (45 USCA § 156) provides: In any case where the services of the· Board of Mediation had been requested by either

fidavit filed herein, that he would not consider these authorizations until the board had so relinquished.[20]

While, with a fell and steady purpose, by striking at the heads of the Brotherhood and of those who were active in it, by depriving them of their positions and power, to kill what it had scotched, it set itself about, with a callous indifference to the spirit as well as the letter of the statute and the order, the task of not only more firmly seating the Association of Clerical Employees, but of crushing any effort on the part of other employees to secure other representation, if they so desired, in the face of Torian's affidavit filed in the original hearing.[21]

In short, upon a foundation laid in direct violation of the statute, they have sought to erect a superstructure of exclusive representation, and in the face of a statute and an injunction designed to secure the observance of the fundamental maxim, "Audita alteram partem," they have gone about to arrange it so that the railroad would be in a position of surely having a vote on both sides of the table, its own side and that of its employees.[22]

In view of all these facts, and of the further controlling and dominant fact that, in the face of the agreement and understanding that the Brotherhood should continue to represent the clerks until by secret ballot other representation was selected, it appears that organizers of the Association of Clerical Employees have been sent out, on company time, and on company pay, and with company consent and approval, to organize the Association, while officers of the Brotherhood have been discharged from the service and excluded from wage conferences, members of the Brotherhood have had their pay docked for the time spent on its business, and other members have been dismissed from the service,[23] it would be a sticking in the bark to discuss in detail the evidences with which this record teems of a deliberate violation of this injunction, legalistic, perhaps, through the advice of counsel, but none the less a violation.[24]

---

party, or said board has proffered its services, rates of pay or rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 5 of this act by the Board of Mediation.

[20] In Torian's affidavit, filed July 28, 1927, he said: "The Association of Clerical Employees claims to represent the majority of said employees under written authorizations from such majority. *The officers of the Association have tendered to affiant, in his official capacity, written authorizations claimed to be held by the Association of a majority of said clerical employees,* but affiant has declined to receive or act upon the same until a certain pending request made by the Brotherhood shall have been disposed of or dismissed by the Board of Mediation. *When the said pending matter shall have been disposed of or dismissed by the United States Board of Mediation, it is the purpose of the said affiant to consider the request.*"

[21] "It is not a fact that, should a majority of the clerical employees of the railway company, other than those in general offices, elect to be represented by the Association, and should affiant and the railroad company deal with the Association, and not with the Brotherhood, the clerical employees now members of the Brotherhood will be forced to withdraw from membership therein, or that the Brotherhood will, of necessity, be dissolved."

[22] Letter of August 12, 1927:
"T. & N. O. Railroad Notice No. 551.
"LaFeyette, La., Aug. 12, 1927.
"Passenger Conductor: If annual pass A 25751, favor H. W. Harper, timekeeper, residence, San Antonio, Texas, S. P. Lines, is presented, take up, collect full fare, and return to this office.
"[Signed] R. M. Clover, Superintendent."

The dropping of Harper from the rolls in September, and Walker in October, without notice or hearing to them. Notation on Harper's record: "Personal Record to September 24, 1927. Dropped from the roll, as he has performed no service since 1923."

[23] The answer of the railroad company, paragraph V, admits that the representatives of the railroad company did exclude Harper at the direction of Torian "because Harper was not wanted"; the Association of Clerical Employees being the sole recognized representative. The answer admits the discharge from service of Harper, the taking up of his pass (paragraphs X and XI), the dropping of Walker, the docking of pay of certain of the Brotherhood members, while making no deduction whatever from the pay of the officers of the Association of Clerical Employees (Answer, paragraph IX), the discharge of the individual employees Stallings, Hudson, and Ginsburg, upon, however, claimed legal grounds.

[24] The following testimony of Waid upon this matter is illuminating:
"Q. Isn't it a very unusual situation for the company to have men active like that, not doing any work, and still carrying them on the pay roll? A. No; we frequently detach men from the service for the purpose of handling matters that are for the general good. For instance, we send men to an organization for fuel conservation each year.
"Q. I do not mean that; I mean in these employees' organizations. Was there ever a case before where the railroad company kept a representative of the employees on the pay roll, and allowed them to stay there without working? Not any case before? A. Oh, I presume there have been, where they were doing work that was worthy of such consideration.
"Q. I know, but the work they are doing now is not worthy of any consideration by the company is it—company work? A. *Yes; it is very*

24 F.(2d)—28

In the view which I have taken that the authorizations on which the company acted were procured in violation of the law, it would serve no purpose to extend this opinion further by a discussion of the hypothesis whether, if lawfully obtained, they were sufficient in number. Entertaining that hypothesis, however, for a moment, I think it plain that there were not sufficient authorizations of those qualified to vote, to constitute a majority. But I think it further plain that, irrespective of the number and of the legality of their obtaining, it was never contemplated that representation of a class could be founded upon conglomerating into a ballot for an Association of Clerical Employees these heterogeneous requests for higher pay.

It is abundantly clear that the injunction issued to prevent such violation has been completely nullified, and that a remedial order should be entered, completely disestablishing the Association of Clerical Employees, as now constituted through the action of the defendant, as representative of their fellows, and re-establishing the Brotherhood as such representative, until by proper ballot the employees, without dictation or interference, vote otherwise, such order to further provide for the restoration to their positions and privileges of the officers of the Brotherhood, and the restoration without loss of those of the employees whose discharge, though nominally predicated upon a violation of the rules, was really grounded upon antipathy because of their action on behalf of the Brotherhood, and that the matters here involved should be referred to the proper law officers of the government, for them to determine whether a proceeding for criminal contempt in the name of the United States should be begun.

---

*much in the interest of the company to secure a proper representation of interests;* and I should think that the company would be very much interested in that.

"Q. So these men are really working for the company in organizing and promoting this association? A. No; I would not say that they are so employed.

"Q. What do you say? A. They merely go, so far as I know—

"Q. *What I mean, you said they were doing work which is greatly to the interest of the company in promoting and insuring friendly organizations;* that is correct? A. Yes, *that is correct.* We feel so.

"Q. And you are maintaining them still on the pay roll in order to enable them to do that? A. I have not said they are on the pay roll.

"Q. I am asking you.

"Mr. Tallichet: If it will clarify the situation, I will say that I got the information, not from Mr. Waid, but Mr. Torian, that we have made no deductions whatever from the pay of these men."