## NATIONAL LABOR RELATIONS BOARD v. BROWN PAPER MILL CO., Inc.
### No. 9250.

Circuit Court of Appeals, Fifth Circuit.
Jan. 17, 1940.
Rehearing Denied March 18, 1940.

Chas. Fahy, Gen. Counsel, Robert B. Watts, Assoc. Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Mortimer B. Wolf, Bertram Edises, and Morris P. Glushien, all of Washington, D. C., for National Labor Relations Board.

Clyde R. Brown, of Monroe, La., and L. J. Benckenstein, of Beaumont, Tex., for respondent.

J. B. Thornhill, of Monroe, La., and Bentley G. Byrnes, of New Orleans, La., for interveners.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

Pursuant to charges by the International Brotherhood of Paper Makers, that Brown Paper Mill, Inc., of Monroe, La., has engaged and is engaging in unfair labor practices in violation of Chapter 7, National Labor Relations Act,[1] there was a complaint and hearing under the act. The

---

[1] 29 U.S.C.A. §§ 151 to 166, inclusive.

charges were, (1) that in violation of Sections 157[2] and 158[3], respondent had interfered with and was interfering with its employees in the exercise of their right of self-organization and representation, by assisting in the formation and administration of a labor organization of its employees, known as the Brown Paper Mill Employees Association, (2) that because of their membership in and affiliation with complainant, respondent had discharged three named employees. There were findings and an order[4] sustaining the complaint of unfair labor practices as to the "association" but rejecting it as to the discharged employees. By this petition, the Board seeks a court decree to enforce its order.

The respondent, Brown Paper Mill, insists that the findings and order, as to unfair labor practices, are without support in the evidence, and that if they are, the order is invalid and improper in three respects.

(1) Because it would compel it against its will to admit an infraction of the law and to confess a commission of an illegal act.

(2) There is no .reasonable ground for disestablishment of the Brown Paper Mill Employees Association.

(3) The order as drawn gives the impression that respondent's employees are prevented from organizing an independent association. It therefore opposes the petition altogether, and in the .alternative,

[2] 29 U.S.C.A. § 157: "*Right of employees as to organization, collective bargaining, etc.* Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

[3] 29 U.S.C.A. § 158: "*Unfair labor practices by employer defined*

"It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it."

[4] "*Order*—Upon the basis of the above findings of fact and conclusions of law, and pursuant to Section 10 (c) of the National Labor Relations Act, the National Labor Relation Board hereby orders that the Brown Paper Mill Company, Inc., Monroe, Louisiana, and its officers, agents, successors, and assigns, shall:

"1. Cease and desist from:

"(a) In any manner dominating or interfering with the administration of Brown Paper Mill Employees Association, or with the formation or administration of any other labor organization of its employees, and from contributing support thereto;

"(b) In any manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining and other mutual aid or protection, as guaranteed in Section 7 of the Act.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from Brown Paper Mill Employees Association as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, and completely disestablish Brown Paper Mill Employees Association as such representative;

"(b) Immediately post notices in conspicuous places throughout its plant and maintain such notices for a period of at least sixty (60) consecutive days, stating (1) that the respondent will cease and desist as aforesaid, and (2) that the respondent will withdraw all recognition from Brown Paper Mill Employees Association as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, and that said organization is completely disestablished as such representative;

"(c) Notify the Regional Director for the Fifteenth Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith.

"And it is ordered that the allegations of the complaint, as amended, in Case No. C-486, that the respondent has engaged in unfair labor practices, within the meaning of Section 8 (3) of the Act, by laying off John Fox and by discharging and refusing to reinstate C. C. Butler and A. G. Scharf, be, and they hereby are, dismissed";

seeks amendment of the order. Appearing by intervention, International Brotherhood of Paper Makers, and three discharged employees of respondent, oppose the enforcement of the order to the extent that it dismisses the complaint as to the three discharged employees. The Brown Paper Mill Employees Association intervenes to oppose the Board's order, particularly that part of it requiring its disestablishment as representative of the employees.

■ Respondent and the intervening association recognize the burden the act imposes upon them, to show that the Board's findings and order are without support in the evidence. They vigorously insist though, that they have more than carried it by the testimony of the "association's" 708 member witnesses, that they were not coerced, dominated or interfered with by respondent and that they want to be represented by the "association;" the testimony of respondent's witnesses that they had not attempted to coerce, dominate or interfere with any of the employees, and the absence of any testimony by the Board's witnesses of the exercise by respondent, of domination, coercion or interference. The Board, on its part, insists, that the evidence that the membership campaign of, and solicitation of the dues[5] for, the "association," was carried on on company time, with company support, through the active interference of tour bosses and others interested on the company's side; that its meetings, both organizational and otherwise, were carried on with the approval and consent of the company on company property, while the meetings of complainant Brotherhood were under company surveillance, and that its organization was begun and fostered at the critical time of the drive of complainant to unionize the plant, after the vice-president and general manager of the company had stated; that the company had not dealt with organized labor in the past, that it was opposed to labor unions, that he recognized that its employees had a right to organize, that if they did organize and the law required it, respondent would deal with them, as it intended to stay within the law, is sufficient without more to support its findings and order. But, it insists that there is much more, in the undisputed testimony as to the formation, first, under company auspices and with company support of the Brown Paper Mill Employees Mutual Benefit Association, and that so organized, the subsequent reorganization under the name intervenor now uses, could not and did not change, the status of the "association," as one not freely formed and organized by the employees, but formed, organized and maintained under the aegis and support of the company. The Board insists in short that it was orginally launched under company auspices to an extent sufficient, at least, to deprive it of the character of a labor organization freely formed and operated by the men themselves, and give it that of one coming into being marked, and in law continuing to be marked, as a company dominated and supported union. Pointing to the declaration of policy contained in Section 151, "it is hereby declared to be the policy of the United States * * * by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection;" and to the provisions of Section 158, that "it shall be an unfair labor practice for an employer * * * to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it," the Board insists that the intervenor association was organized, and is operating, contrary both to the declared policy and the terms of the act. It points, too, to the decision of the Supreme Court in National Labor Relations Board v. Newport News Shipbuilding & Drydock Co., 60 S.Ct. 203, 84 L.Ed.——, December 4, 1939, that an association once organized under company domination, in eye of the law, continues as so organized, despite changes in its structure and organization and the only remedy for such a situation is complete disestablishment and a new beginning, National Labor Relations Board v. Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

■ We agree with the Board. The act does not compel employees to affiliate themselves with existing national or other unions or associations, nor does it prevent them from forming truly independent local associations of their own. But it does

---

[5] It makes the point too, that the dues were so insignificant and their collection so little enforced as to show on its face that the "association" was not self-constituted and independent.

flatly prevent and prohibit the formation of associations of employees for bargaining, which, though they are ostensibly independent, are really supported, controlled or influenced, though ever so slightly, by the management. The statute recognizes two parties to a labor bargaining compact. It requires that the employees in bargaining be completely independent of the employer so that in the bargaining, labor will be represented by persons or organizations having only its interest in mind, and acting wholly uninfluenced by fear or favor, of or from the management. Therefore, when once it appears that management has had a hand in organizing, supporting or in any wise interfering or collaborating with an "association" of employees, such an association may not be recognized as the free and voluntary association of employees called for in the act. If in such cases the employees really intend and want it to be such, their only sure course is to disestablish it as the bargaining agency and, entirely dissolving it, begin organization anew, upon their own time and their own devices without aid or comfort from the management. This, of course, does not mean that the fact alone that it appears that the management would prefer to deal with a local unaffiliated "association" confined to the employees of its plant, rather than with an affiliated national or other organization, will, nothing else appearing, justify a finding that the local "association" is not freely formed and acting. But, when, as here, at the beginning of an organizational campaign by a nationally affiliated labor union, the management frankly declares, that it never has had and does not want to have its men organized, though it, of course, recognizes that under the Wagner Act its men have a right to organize, the record ought to be entirely free of evidence that the management has, through officers or employees, not officers, but having the confidence of the management, and acting for it, lent aid and comfort of any tangible kind to the formation or conduct of an independent organization, or has discriminated in any way in its favor, as against the affiliated union as to company time and premises, or otherwise.

Viewing this evidence as we must, not as a matter of original impression, and from the standpoint of what our own finding would be on it, but as our duty is, from the standpoint of whether there is any evidence to support the Board's findings that the "association" was not freely formed and acting, we think it may not be doubted that the record amply supports the findings and the order. For, giving fullest effect to the affidavits and testimony of the members of intervenor association that what they did, they did of their own free will and accord and without domination and interference, and assuming as on this record we may, since the testimony was given after the contest had been joined, that these employees so testifying really do not want to join complainant Brotherhood, but prefer their own association, which, of course, they have a right to form if independently formed, it still remains that the record before us supports the Board's findings and order that the intervenor "association" is not freely formed and acting, but is company bound, and that it should be completely disestablished as representative of the employees. This does not mean of course, nor does the order in any wise declare, that the employees may not immediately, provided it is with complete independence and freedom from the domination, interference or support of the management, form their own union. It certainly does not mean that they must join the organization of complainant. It merely condemns the intervenor association as, to an extent at least, a company union, and, as such, requires its disestablishment as representative.

Respondent's complaint of the order, that it requires it to confess the guilt it has all along denied, and that, if it publishes the notices the order requires, it will be not only confessing sin, but in the position of advising its employees that they cannot organize and maintain an independent union, is not well taken. The order is in the usual form, approved by this court in numerous cases, beginning with Agwilines v. National Labor Relations Board, 5 Cir., 87 F.2d 146. It requires no confession. It merely orders appellant to state that it will comply with the Board's order. It has judicial precedent in the decree in the Clerk's case,[6] and it in no manner in-

---

[6] Brotherhood of Ry. & S. 'S. Clerks v. Texas & N. O. R. Co., D.C., 24 F.2d 426, 427; Id., D.C., 25 F.2d 873, 874–876; Cf. National Labor Relations Board v. Greyhound Lines, 303 U.S. 261, 266, 267, 268, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

terferes with or purports to interfere with the exercise by the employees of their truly independent choice. Respondent makes a good deal of the fact that one of the Brotherhood leaders admits that it brought the charges for the purpose of helping its organizational campaign. If the "association" now ordered disestablished really exists and draws its strength only because of, and from, the support and interference of the management, and, with its death, such impulse as there was among the employees to organize independently, will die too, the dissolution undoubtedly and properly will give strength to the Brotherhood's campaign. But, the fact that it will help the Brotherhood in no manner detracts from the force or efficacy of the remedy the act affords, to complain of unfair labor practices on the part of an employer. On the other hand, if as respondent and association intervenor contends, the association is really independent and such aid and comfort as the record shows was given it by the management, was merely incidental, and not of its essence, if the employees really prefer an independent local organization of their own, to that the Brotherhood offers, the act of complainant in pursuing and harrassing them and their association by this proceeding, will not help complainant's reorganization campaign, but will only solidify the employees against joining the Brotherhood and for forming a union of their own. But, until the Board's order has been faithfully carried out, and the employees have determined for themselves, the form of organization and representation they desire, these are matters of speculation and argument. The point that the Brotherhood may benefit or lose by this proceeding is not material to it. The law is not concerned with what organization employees may form or join. It is concerned only with seeing that that joining is free from company interference, influence or support.

Little need be said about the intervention on behalf of Butler, Fox and Scharf. In support of their claim that the Board wrongly dismissed their petition for reinstatement and reparation, these intervenors find themselves in the difficult position in which the respondent and the "association," the other intervenor, found themselves. They have a heavy burden to overthrow the Board's findings. Respondent gave as a reason for the discharges, grounds having nothing whatever to do with labor activities on the part of the discharged men. The Board found that the reasons given were the real grounds for the discharge. There is evidence to support the finding. We may not disturb it. The Board's findings throughout are supported by evidence, the order is appropriate to its findings. The petition to enforce it is granted. An appropriate decree may be drawn and presented for entry.