**ILSENG et al. v. UNITED STATES.**

Nos. 9095–9097.

Circuit Court of Appeals, Ninth Circuit.

June 13, 1941.

Rehearing Denied July 23, 1941.

David H. Cannon, Ames Peterson, and Halverson & Halverson, all of Los Angeles, Cal., for appellants.

Wm. Fleet Palmer, U. S. Atty., and Walter M. Campbell and Leo V. Silverstein, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

An indictment was returned September 29, 1937, charging Andrew G. Ilseng, hereinafter referred to as Ilseng Sr., Andrew Grant Ilseng, Jr., hereinafter referred to as Ilseng Jr., Leslie A. McKercher and four others with the violation of 18 U.S.C.A. § 338, and 18 U.S.C.A. § 88. The indictment charges these persons in 19 counts of using the mails in furtherance of a scheme to defraud, and 1 count (count 20) with conspiracy to accomplish their designs. Under appropriate stipulation the case was tried to the judge without the aid of a jury and resulted in the judgment of guilt and sentence against both the Ilsengs and McKercher on all counts except 9 and 16. The record is silent as to the court's conclusions upon these two counts. These three persons were also found guilty under the conspiracy count and were sentenced thereunder.

Motions to dismiss the case as to each and every count and as to each and every defendant was made at the conclusion of the Government's case upon the ground of insufficiency of the evidence. The motion was granted as to all but the three subsequently found guilty and as to them it was denied.

Ilseng Sr. was in active control of various mining corporations, bearing the following names: International Mining Co., International Mining and Milling Company and Mount Gaines Mining Company. It is alleged that during the years 1932 to 1937, inclusive, Ilseng Sr. and the others indicted, devised a scheme to defraud various persons by inducing them to extend credit to and invest in such mining organizations by the purchase of stock and other interests. In furtherance of such scheme, certain letters with enclosures of circulars, pamphlets, maps, advertisements, writings and papers each containing fraudulent statements, were sent through the United States Mails. There is no claim that Ilseng Sr. did not cause such use of the mails.

Such statements in part are to the effect: That for a small sum of money, an interest in fabulously rich gold mines could be purchased; that these mines had and would easily produce a million dollars a year; that in one mine alone (Palmetto mine) a tunnel cross-cuts eleven veins of gold ore, several of which are as large in themselves as the whole of some profitable mines; that the mines were and for six months had been producing ore ranging from $8 to $600 per ton, and much ore had been blocked out for future mining; that a profit from $100 would be $2,000, from $1,000 would be $220,000; and that one of the groups of mines, the Gold Field Palmetto, had high grade ore. That in this group eight veins had been opened ranging in thickness from 18 to 114 inches; that the last vein was 8 feet thick; that one of these veins is 9 feet thick, gold bearing volcanic ash assaying $8.33 per ton and estimated in value at $3,000,000; that another vein 2 feet 6 inches thick is of quartz ore so rich with free gold it can be seen by the naked eye; that ore blocked out is computed in the thousands of tons; that the investments are secure and some coupons were being paid up already; that a dividend on outstanding Class A stock of record January 20, 1934, was declared, and a purchase of such stock before that date entitled purchaser to such dividends; that the financial condition of the corporations justified such dividends. The evidence shows that dividends were actually declared and were paid.

Appellants seek reversal upon claims that books and records were introduced without proper foundation for their coming into evidence and that improper conclusions therefrom were given in testimony; that certain testimony of the mining

experts was without proper foundation and was speculative; that with improper testimony eliminated no substantial evidence of appellants' guilt remains in the case.

■ Evidence as to the falsity of the statements contained in the indictment letters and inclosures with regard to mine conditions was introduced through witnesses William M. Balling, and A. V. Udell, who qualified as mining experts. Mr. Balling inspected the mines in 1938 and was questioned as to their condition as he found them in comparison with the referred to statements. Suffice it to say that the testimony of Balling and Udell was that the mining properties did not justify the glowing accounts of their productive qualities and that such accounts were based upon asserted but non-existent facts. Appellants do not contend that the testimony is insufficient to sustain the judgments if it was properly admitted into evidence. Each appellant contends that such testimony was too speculative to be admitted as evidence since the experts inspected the mines at a date later than the period covered by the alleged misdeeds. It is true that the inspection was a few years later (1938) but in the nature of things a radical change in the physical make up of the mines could not have taken place. Their inspection was not prevented by cave-ins, flooding or other happenings. There was no error in the reception of this evidence and no error in the reception of conclusions of these experts as opinion evidence.

■ Appellants claim that there was no sufficient foundation laid for the introduction of the books and records of the mining enterprises which were used as evidence of and from which was adduced testimony as to the falsity of representations concerning the financial condition of the mining companies and the representations as to the payment of dividends and as to prospective dividends and evidence that dividends paid were not paid out of profits as represented to be the fact.

Mr. F. E. Smith, Post Office Inspector, testified that he had seized books and records in the office of International Mining and Milling Company, on North Martel Ave., Los Angeles, California; That, quoting: "I would say that the books of account which I examined in May, 1937, are in the same condition now as they were then except for the change I pointed out." (The change was one in the minute books post dating the salary of Andrew G. Ilseng, appellant here, one year.)

Mr. Robert V. Schupbacher, testified that he was an accountant employed by International Mining and Milling Company from April 2, 1934, to August 23, 1936, and kept the books during that period. That the books exhibited to him while he was testifying were the books of the company and that they consisted of all of the company's books when he came to work and that he had made entries in some of them during his employment but had not made entries in all nor made all the entries in any.

Mr. John L. Reimer testified: "I have been a certified public accountant since 1922 and have been engaged in that profession continuously since that time. I was employed by A. G. Ilseng [appellant] in May, 1937, to make an audit for the International Mining and Milling Co. The books that you show me, being Government's Exhibits 5 to 25 inclusive, for identification were books that were made available to me for audit purposes and which I used."

The federal statute relating to the admission of books and records into evidence reads [28 U.S.C.A. §§ 695 and 695h],

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term 'business' shall include business, profession, occupation, and calling of every kind.

\*     \*     \*     \*     \*

"Sections 695 to 695h of this title shall be prospective only, and not retroactive."

Appellants specify and assign here the particulars in which there was an absence of foundation for the introduction of the books and records as that they had not been shown to have been kept in the regular course of business; and that the books them-

selves could not be used to determine whether or not they had been kept in the regular due course of business. The court overruled all of these objections and we think correctly. It appears that the books and records objected to were furnished to both Schupbacher, the bookkeeper, and to Reimer, the certified public accountant, by Ilseng, Sr. as the books and records of the mining concerns. Reimer was furnished with them for the purpose of making a financial statement to be used and which was used in the course of the concern's business. These facts preclude Ilseng Sr. from contending that such books and records may not be utilized by the Government excepting through a strict showing as to method and practice used in keeping them.

■ Appellants argue that the introduction of these books and records into evidence is tantamount to giving the statute a retroactive effect in the face of the provision in the statute that it shall be applied prospectively only, but we cannot agree with them. In Greenbaum v. United States, 9 Cir., 98 F.2d 574, this court held that the statute would not be effective as to causes in which the indictment antedated it. The indictment here was returned long after the statute became effective. It is true that some of the dates in the records introduced in the instant case predate the statute and Valli v. United States, 1 Cir., 94 F.2d 687, holds them to be inadmissible. The date of the indictment does not appear in the report of the cited case. The later, and in our opinion the better reasoned, case of Landay v. United States, 6 Cir., 108 F.2d 698, holds that the statute changes the rule of evidence and that [page 705]: "The nature of the statute and its purpose demonstrate that § 695h [the provision against the statute being retrospective] was not intended to shut out records which had been made prior to the enactment of the statute. This statute is remedial, intended to remedy the difficulty of securing evidence owing to the absence, death, or nonavailability of those who personally make up business records, and owing also to the use of mechanical devices and subdivision of records under modern corporate accounting methods, which make it impossible to comply with the common law rule. H. R. 2357. The statute does not purport to affect the making of records, but only their admissibility in evidence. To hold that it applies only to records made after the effective date of the act in many cases would completely nullify the purpose of the statute.

Moreover, the provision as to retroactivity relates to nine preceding sections. In general these sections cover rules for the admission in evidence of writings and records made in the general course of business, but they also include other provisions, such as the manner of taking testimony before a consular officer (§ 695c), the fees of consuls and witnesses (§ 695f). As to these sections the provision that the enactment shall not be retroactive cannot relate to the time of making a record, that is, creating the evidence. It must relate to the time that the case was instituted in which the evidence is sought to be produced for this is the only construction as to retroactivity which sensibly and uniformly applies to all of the preceding sections."

■ While we hold that the books and records were properly admitted into evidence and were clearly applicable to the case of Ilseng Sr. it is just as clearly evident that they must actually be connected with the other appellants in some sufficient manner or through a finding that the other appellants are co-conspirators with Ilseng Sr. before they can properly be applicable to them and their causes. 11 Am.Jur. § 40. Since the court found them to be co-conspirators the receipt of these proffered exhibits was correct as to them only if the evidence sustains such finding. We shall proceed to discuss this question.

It is said in the Government's opening brief that "The defendant McKercher was associated with defendant A. G. Ilseng as far back as 1932," but what this association consisted of we do not know. Ilseng Sr. testified that he "was responsible for the determination of the policies and the operation of the company". In response to McKercher's attorney's assertion that it would appear that McKercher was only a salesman, Government counsel at the trial announced, "I want to state that neither Mr. ———— nor Mr. McKercher appear as connected with these companies".

We shall trace the relation of Mr. McKercher to the mining concerns as the evidence reveals it. In the fall of 1932 Mr. McKercher approached a Mr. Mark Edgerton purportedly for Ilseng Sr. and suggested some sort of stock trade whereby a judgment claimed to be owned by a corporation named Silver Leaf Metals was acquired by International Mining and Milling Company and set up as an asset of such company for over $82,000 which entered into false financial statements of such company whereas

the Government claimed that no such judgment existed at the time or at any later time. On November 3rd, 1933, in a letter to Edgerton, McKercher is found suggesting that a Miss Wright sell her diamond and invest the receipt in International Mining and Milling Company, calling attention to the fact that a dividend would be paid in January. Another letter to Edgerton answering a suggestion that certificates be in hand further suggests "send you the dividend checks to deliver. What say—Take them some real money and then try for sales * * *". Here we find McKercher suggesting that stock sales be urged upon a dividend to be declared some two months before its date.

A Mr. and Mrs. Frederick had purchased stock and had become dissatisfied. Ilseng Sr. had sent money to them to come to Los Angeles, from a distance, and McKercher met them and took them to Ilseng, Sr.

J. J. Hostetter met McKercher in California and went to the mine with him. On December 18, 1936, McKercher wrote "as you understand, we do owe a lot of money. Small items that a person would hardly consider, cost thousands of dollars. However if our ore keeps up 60 days I am confident it will clear away all of our obligations."

Dr. Whitlock negotiated with both Ilseng Sr. and McKercher for the transfer of International Mining and Milling Company stock to be paid for partially in money and partially by transfer of an automobile. The automobile was transferred to McKercher. Dr. Whitlock consulted with both McKercher and Ilseng Sr. at the doctor's home about his becoming a director of the company. In June of 1936 the following letter was mailed to Dr. Whitlock from McKercher:

"Dear Doctor Whitlock:
"Your telegram of the 11th, was received by Mr. Ilseng yesterday morning, and we wired you as follows:
" 'Retel attorney preparing waiver and documents requested which will be mailed tomorrow stop Please arrange meeting for fifteenth stop When new board perfects financial arrangements Monday wire me immediately stop On receipt of satisfactory confirmation will arrange to leave for New York June twentieth accompanied by Mr. McKercher.'
"The required documents have now been sent you, and you are in a position to proceed with the meeting of the new board, which according to your information will be held Monday, June 15th, in New York City.
"Your telegram requested information of requirements of the company. As I submitted you a schedule of the present needs with my letter of the 11th I have not given further attention, as the information furnished I believe is what you require. It is not complete *by* approximately correct.
"Very sincerely,
"L. A. McKercher."

There is other evidence but we think the recital has gone far enough to show that the court had ample evidence upon which to find that McKercher was cooperating with Ilseng Sr. in making false representations in order to sell stock. Although led by Ilseng Sr. and no doubt influenced by him we cannot find that the case is without substantial evidence to support the court's finding of guilt as to the conspiracy count of the indictment. It is, of course, well settled that collusion to perform illegal acts need not be established by direct evidence thereof but may be inferred from acts of the parties. See text and supporting authority 11 Am.Jr. § 38. This being so of course the question heretofore left open as to the admissibility of the books and records of the mining companies is solved. The books and records were properly admitted as against McKercher.

Ilseng Jr. was a director and vice president of International Mining and Milling Company from early in 1935 and into the fall of 1936; he was one of the incorporators and vice president of the Mount Gaines Mining Co. In 1933 he, with another man, praised the International Mining and Milling Company to Frank J. Buys and sold him 1,000 shares of stock in that company. He sold stock in such company to F. M. Frederick. A letter from Ilseng Sr. in 1933 to Buys shows that Sr. and Jr. were working together in the stock selling of the International Mining and Milling Company. There are numerous letters in evidence signed Ilseng Jr. and mailed relative to the business affairs and to the selling of stock and the payment of money for the stock of International Mining and Milling Company.

There is other evidence showing the rather close connection with Ilseng Jr. to the whole affair and we hold that there is ample and substantial evidence to support the conclusion of the court that he was a

828

co-conspirator. As in the case of McKercher it is claimed by Ilseng Jr. that the books and records heretofore referred to were improperly admitted into evidence. In the circumstance the books and records were properly received.

■ The use of the United States mails in the allegations covering count 1 of the indictment is confined to a letter signed by an attorney, one of the indictees who was dismissed by the court at the conclusion of the Government's case. This letter is dated May 16, 1935, and appears to be in furtherance of an attempt to compromise the International Mining and Milling Company's indebtedness. This letter is not connected in any way with any of the appellants. We fail to see how the conviction of violating the mail fraud statute under this count by either or any of the appellants can be supported, and the judgment is therefore reversed in regard thereto.

■ The court made no definite disposition of counts 9 and 16, and in pronouncing sentence pronounced specifically as to count 1 of the indictment, the conviction upon which is here reversed. It then sentenced upon the other counts of the indictment upon which it had found appellants guilty by reference to and providing that they should run concurrently with the sentence pronounced under count 1. We deem it proper that the concurrent sentences should be based upon a count of the indictment upon which the appellants were found guilty and which is here sustained, therefore the sentences pronounced are hereby set aside. The cause is remanded to the trial court for resentence of appellants and for disposition of counts 9 and 16.