**SPERRY GYROSCOPE CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.**

**BROTHERHOOD OF SCIENTIFIC INSTRUMENT MAKERS OF AMERICA, v. NATIONAL LABOR RELATIONS BOARD.**

**No. 259.**

Circuit Court of Appeals, Second Circuit.

July 3, 1942.

Chadbourne, Wallace, Parke & Whiteside, of New York City (Horace G. Hitchcock and Walter T. Southworth, both of New York City, of Counsel), for petitioner Sperry Gyroscope Co., Inc.

Robert B. Watts, Ernest A. Gross, Gerhard P. Van Arkel, Morris P. Glushien, and Ann Landy Wolf, all of Washington, D. C., for respondent.

Math & Glassman, of New York City, for petitioner Brotherhood of Scientific Instrument Makers of America.

Before SWAN, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The Sperry Gyroscope Company, Inc., and the Brotherhood of Scientific Instrument Makers of America ask us to review and set aside an order of the National Labor Relations Board directing Sperry to withdraw recognition from and disestablish the Brotherhood, to terminate an existing closed-shop agreement with the Brotherhood, and to reinstate with back pay an employee discharged pursuant to that agreement. The Board, by its answer, has asked that its order be enforced. The reason assigned by the Board for its order was that the Brotherhood was a company-

dominated union, and that by dominating it, Sperry had violated § 8(2) of the National Labor Relations Act, 29 U.S.C.A. § 158(2). The Board also decided that the discharge was a violation of § 8(3) and that Sperry had also violated § 8(1).

1. Perhaps it should be unnecessary to do so, but, in view of recurrent misconceptions encountered by us in Labor Board cases, we think it well to state at the outset that, under repeated and unequivocal rulings of the Supreme Court, it is not proper for us to consider whether we would have made the same findings of fact as did the Board or whether, on the basis of those findings, assuming them to be correct, we would have deemed it wise to make the order entered by the Board. Our function, says the Supreme Court, is narrowly limited to determining (a) whether there was substantial evidence to support the Board's findings of fact and (b) whether, on the basis of those findings, if thus supported, the Board had the statutory power to make its order.[1] It is our duty in this case to comply with the Act enacted by Congress, as interpreted by the Supreme Court, our personal views being entirely irrelevant.

These prefatory remarks are especially appropriate here because something is sought to be made of the fact that one of the three Board members dissented and went on record as favoring dismissal of the proceeding. This he did most laconically, without the slightest indication of his reasons. He did not state (a) what he thought to be the facts, i.e., whether he disagreed with the fact-findings of his colleagues, or (b) whether, assuming those findings to be correct, he thought the order legally unsound or (c) whether he merely believed that the order, although valid, was undesirable as a matter of policy in the exercise of the Board's discretion.[2] For all we know, he may have concurred in the findings of fact, and (perhaps for erroneous reasons) disagreed as to the legal power of the Board; if his disagreement with his colleagues was grounded on his

views of policy,[3] it is obviously no concern of ours. In any event, the Board acts as a unit, and a dissent no more reduces the legal effect of its findings and order than does a dissenting opinion of a member of a court detract from the legal effect of the court's judgment.

Before discussing the Board's findings of fact, we call attention to a mistaken notion which underlies much of the company's argument: § 8(2) of the Act does not forbid merely "interference" by an employer. It also, disjunctively, provides that "domination" of a union by an employer is unlawful. Domination arising from earlier acts of an employer may be violative of the Act even when the employer has stopped all active "interference." It is the provision of the statute as to "domination" on which this case turns.

And, in applying that provision, the courts and the Board must be guided by the statutory interpretation of the Supreme Court. The central factor, we are told, is the state of mind of the employees. In International Ass'n of Machinists v. N.L. R.B., 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50, the Supreme Court said that *"where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management,* the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." And the court further said that *such a conclusion may be reached by the Board "even though the acts of the so-called agents were not expressly authorized or might not be attributable to"* the employer *"on strict application of the rules of respondeat superior,"* since under that Act "we are dealing * * * not with * * * technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or in-

---

[1] N. L. R. B. v. Waterman S. S. Corp., 309 U.S. 206, 208, 209, 60 S.Ct. 493, 84 L.Ed. 704; N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 342, 343, 60 S. Ct. 918, 84 L.Ed. 1226; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 229–231, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Quality Art Novelty Co.,

Inc., 2 Cir., May 22, 1942, 127 F.2d 903.

[2] Cf. Virginian Ry. Co. v. United States, 272 U.S. 658, 674, 675, 47 S.Ct. 222, 71 L.Ed. 463.

[3] For some wise words on the need for differentiating between policy and fact questions, see Benjamin, Administrative Adjudication in New York (1942) 22-23.

fluence."[4] See, also, N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 585, 599, 61 S.Ct. 358, 85 L.Ed. 368; H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 520, 61 S.Ct. 320, 85 L.Ed. 309. Commenting on these cases, we said in N. L. R. B. v. Moench Tanning Co., 2 Cir., 121 F.2d 951, 953, that the issue is as to "creating a belief" in the mind of the employees concerning the employer's attitude and added: "Our powers of review over that decision are especially narrow, the issue being regarded as one in which the Board is peculiarly adept."

So that the question here, for us, is indeed narrow: Was there substantial evidence to support the Board's finding that a union with which the company contracted in June, 1939, was at that time dominated by the company?

█ Again, because of misconceptions, we note that it has often been held that, in fact-finding, in a case of this kind, involving a charge of violations of the duty not to maintain a forbidden relation, a reliance on so-called circumstantial evidence is not only permissible but often essential. In the very nature of such a case, there will seldom be discoverable data showing direct statements by a party charged with violation that he has performed improper acts. See, e.g., N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 597, 600, 61 S.Ct. 358, 85 L.Ed. 368; Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658, 660; cf. Morgan Stanley & Co. v. Securities & Exchange Comm., 2 Cir., 126 F.2d 325, 332, 333; Detroit Edison Co. v. Securities & Exchange Comm., 6 Cir., 119 F.2d 730, 739; International Ass'n of Machinist v. N. L. R. B., 71 App.D.C. 175, 110 F.2d 29, 39.[5]

2. In broad outline, this is what the Board found: For seventeen years before the passage of the Act—July 5, 1935—the company maintained a company-dominated union. On that date, a continuation of the domination of that union (then known as S. H. E. A.) became unlawful. Yet the company ignoring the Act, continued to dominate that union at least until July 20, 1938 (the name of the union having been changed in April 1938 to Independent). There was thus some twenty years of uninterrupted domination of a union in at least three of which the domination was unlawful. On June 21, 1939, the company and that union (which had again changed its name, in October, 1938, to Brotherhood) executed an exclusive bargaining agreement. The company contends that, even assuming domination up to July 20, 1938, it ceased on that date when, pursuant to a stipulation with the Board, agreed to on the previous day, the company published a disavowal of any future relations with that union. The Board found that such domination still existed eleven months later when the agreement with the union was signed. If there is substantial evidence to sustain that finding of the Board, its order is valid. We shall now consider the facts more in detail.

3. In 1918 the company assisted in the formation of an organization of its salaried and other employees, known as S. P. I. A. In 1933, S. P. I. A. was divided into two parts. We are concerned solely with the successor organization, S. H. E. A., which represented the hourly employees. There is ample evidence that the company dominated S. P. I. A. and its offspring, S. H. E. A., until April, 1938. In March and April, 1938, steps were taken which resulted, the company asserts, in the creation of a new organization, Independent. But the Board found, and substantial evidence supports the finding, that Independent was merely S. H. E. A. under a new name. The first step was taken at a meeting of S. H. E. A.'s Council, held on March 21, 1938. There was testimony that Sylvester, who was President of S. H. E. A., said that "they were going to change the constitution and the name of the S. H. E. A. to conform with the Labor Act," but that "it would be the exact same organization," and that Temme, S. H. E. A.'s vice-president, said the same. A committee was appointed to draft a new constitution. Its draft was approved by the S. H. E. A. Council on April 7, 1938, and was presented for the

---

4 Emphasis added.

5 This has often been held in the conspiracy cases. See, e.g., Radin v. United States, 2 Cir., 189 F. 568; Ilseng v. United States, 9 Cir., 120 F.2d 823, 827; United States v. Potash, 2 Cir., 118 F. 2d 54, 56; Marino v. United States, 9

Cir., 91 F.2d 691, 699, 113 A.L.R. 975; Clune v. United States, 159 U.S. 590, 592, 16 S.Ct. 125, 40 L.Ed. 269.

See, also, Wagg v. Herbert, 215 U.S. 546, 551, 30 S.Ct. 218, 54 L.Ed. 321; Glasser v. United States, January 15, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. —.

membership's approval at a special meeting held on April 27, 1938. No one was allowed at this meeting unless he presented his S. H. E. A. dues book. On this evidence, the Board was justified in finding that Independent was but a refurbished version of S. H. E. A., and that the effect of employer-domination was not destroyed by the new name or constitution.

In October 1938, according to the company's argument, a new and distinct union appeared, named Brotherhood. But the Brotherhood's attorney, in January 1939, openly stated on its behalf: "We are the Independent. We make no bones. We changed the name, that was all, and elected new officers."

We cannot, therefore, disturb the Board's findings that S. H. E. A. was a part of S. P. I. A., that Independent is but an alias of S. H. E. A., and that Brotherhood is but an alias of Independent. That the Board's finding that this multi-named union was dominated by the company down to, and including July 19, 1938, is supported by ample evidence there can be no doubt. The hotly contested issue, to which we now turn, is as to the period thereafter.

4. We have, here, adequately supported findings of twenty years of uninterrupted company domination of a single union (that domination during the last three of those twenty years being unlawful under the Act) lasting at least up to and including July 19, 1938. As the courts have often held, experience teaches that such a long continued influence does not suddenly evaporate. There is, therefore, a considerable likelihood that the old domination continued, in the absence of proof of powerful counterforces. The Board could, then, reasonably make an inference that it continued eleven months after July 19, 1938 (until June 21, 1939, when the company and that union made an exclusive bargaining agreement) unless the company showed facts occurring in that interval which rendered such an inference irrational. To use conventional (but inexact) language, the company "had the burden" of overcoming the "presumption" that the domination, which endured for two decades, down to and including July 19, 1938, was still operative eleven months later. In many contexts (and especially in the Labor Act "domination" cases) it has been held that there is a strong "presumption"[6] of the continuation of a relationship (or other fact), once it is proved to have existed. See, e.g., N. L. R. B. v. Piqua, etc., Co., 6 Cir., 109 F.2d 552, 554; N. L. R. B. v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 660; N. L. R. B. v. Hawk & Buck Co., 5 Cir., 120 F.2d 903, 905; Morgan Stanley & Co. v. Securities & Exchange Comm., 2 Cir., 126 F.2d 325; Dunbar v. Commissioner, 7 Cir., 119 F.2d 367, 370, 135 A.L.R. 1424; Eureka Bank v. Bay, 90 Kan. 506, 135 P. 584, 585; 22 C.J. 87ff; 31 C.J.S., Evidence, § 116.

5. The company contends that it has unquestionably borne the burden of overcoming such an inference. It says that, assuming that Brotherhood and Independent are the same and that the company unlawfully dominated Independent up to and including July 19, 1938, yet the next day, July 20, 1938, that domination was destroyed. The pertinent facts are as follows:

As a result of complaints made by C. I. O., and of resulting negotiations, the company orally agreed with the Board, on July 19, 1938, to enter into a stipulation with the Board. The stipulation was formally executed the next day, July 20. It separately covered the relations of the company with S. H. E. A. and with Independent, because the company was willing to admit that it had dominated S. H. E. A. but did not want to concede that it also dominated Independent. Accordingly, the company stipulated to "withdraw all recognition from" S. H. E. A., and agreed that it "will not recognize" Independent "as a representative of its employees for the purpose of dealing with it. concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, and completely disavows any relationship with said organization as such representative." The stipulation further provided that the company would post throughout its plant notices containing the stipulation. This the company did beginning July 20, 1938, and for 60 consecutive days thereafter.

But a significant fact occurred on July 19, 1938, the day on which the company agreed to sign the stipulation and the day before it was formally executed and first posted. On July 19, Independent (which for reasons previously noted we must take as then company-dominated) circulated among the employees a notice of a mass-meeting to be held that night. These notices

---

[6] That is, there is the basis for an am- ply justifiable inference.

read in part: *"If you want to keep your own union alive* and keep C. I. O. out of the picture, *don't fail to attend this meeting!"*; the notices further described the purpose of the meeting thus: *"We want to show * * * that our workers can only be served through Independent."*

The company's foremen knew of this meeting and granted permission to the night-shift employees to "punch out their clock" and to leave their work for about an hour and a half in order to attend it. Whole departments were left idle. On the tool crib only a sign was left to notify other employees, "Down at the meeting; if you want any tools, ask your foreman on the job." The Board found that the men on the night-shift had attended the meeting "with the knowledge and consent of their foreman," and that the company had thus given its "tacit approval" to the holding of the meeting. That inference is sufficiently supported by the evidence.

We have, then, a meeting held, with the approval of the company, in order to "keep alive" Independent, a union then still company-dominated, and to show that the "workers can only be served through" that union, i.e., a meeting with the announced purpose of perpetuating this dominated union as the employees' bargaining representative. The officials of Independent had participated in the negotiations with the Board and must have known when the mass meeting was held that the company had already agreed to sign a stipulation disavowing that union. We cannot say that the Board erred in inferring as a fact that the holding of such a meeting, on the very night before the stipulation was signed and published, in which the company agreed to have nothing more to do with Independent, "served to counteract" that published disavowal.

For, in such a case as this, the crucial fact, so the Supreme Court has crisply told us, is not the company's actual purpose or intent but the effect on the employees' state of mind, i.e., what the employees might reasonably believe was the employer's at-titude. This the Supreme Court made sharply clear in the language quoted above from International Ass'n of Machinists v. N. L. R. B., 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50: If the employees, said the court, "would have just cause to believe" that representatives of a union were "acting for and on behalf of the management, the Board would be justified in concluding" that the employees "did not have the complete and unhampered freedom of choice which the Act contemplates." Technical concepts of principal and agent, the court added, are not pertinent, because, it said, the test is whether there exists "collective bargaining * * * [free] from all taint of an employer's compulsion, domination, or influence."[7]

As, under that Supreme Court ruling, the state of mind or belief of the employees is crucial, we cannot say that the Board irrationally inferred that the company's tacit approval of Independent's mass-meeting held on the night of July 19, 1938, nullified the effect on the minds of the employees of a publication, beginning the next day, of the company's disavowal of Independent. Whether we would have made that same inference had we been the fact-finders is irrelevant The issue whether the so-called "presumption" of the continuance of the twenty-year domination of Independent was overcome by that disavowal was an issue of fact to be decided by the Board. There was substantial evidence to sustain its finding that it was not so overcome. Accordingly, we must take it as a fact that the disavowal was ineffective and that the forbidden relations between the company and the union continued after July 20, 1938, as theretofore.

Analogies—if any are needed—are at hand: In actions for criminal conspiracy (where the penalties are penal and far more severe than under N. L. R. A.) it has often been held that, if once it be shown that a person has been a member of a conspiracy, his continued connection therewith will be "presumed," i.e., the jury may properly infer that continuation.[8] Such a

---

7 See, also, N. L. R. B. v. Link-Belt Co., supra, 311 U.S. at page 588, 61 S.Ct. 358, 85 L.Ed. 368; H. J. Heinz Co. v. N. L. R. B., Supra; N. J. R. B. v. Moench Tanning Co., supra.

8 See, e.g., Hyde v. United States, 225 U.S. 347, 369, 370, 371, 372, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Local 167 v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804; Nyquist v. United States, 6 Cir., 2 F.2d 504, 505; United States v. Rollnick, 2 Cir., 91 F. 2d 911, 918; United States v. Graham, 2 Cir., 102 F.2d 436, 444; Sunderland v. United States, 8 Cir., 19 F.2d 202, 217, 218; Telman v. United States, 10 Cir., 67 F.2d 716, 718; Boyle v. United States, 7 Cir., 259 F. 803, 807; Marino v. United States, 9 Cir., 91 F.2d 691, 695, 113 A.L.R. 975.

person then has "the burden" of overcoming that inference. He may do so by proving that he had ceased to participate. Proof of that fact may take the form of a public disavowal of any further connection with the other conspirators. But, notwithstanding such a disavowal, the jury may find that his participation did not end. The question of whether the disavowal was effective in accomplishing a severance of the former relation is one of fact for the jury. See, e.g., Hyde v. United States, 225 U.S. 347, 371, 372, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Simpson v. United States, 9 Cir., 289 F. 188, 191; Sunderland v. United States, 8 Cir., 19 F.2d 202, 217, 218; United States v. Rollnick, 2 Cir., 91 F.2d 911, 918; cf. Wilkerson v. United States, 7 Cir., 41 F.2d 654; 23 C.J.S., Criminal Law, § 1137, p. 634, § 1138, pp. 639, 649, 650.

Consequently, in the instant case, the effect on the minds of the employees of the company's public disavowal was, in the light of all the evidence, for the Board to determine as a matter of fact. Had a jury returned a verdict against the company on the evidence in this record, we would have refused to direct that it be set aside. And the Supreme Court has often held that the fact-findings of an administrative agency, like the Board, must be accorded an even higher dignity than that of a jury, because the findings of such agencies are those of specialists in a particular field advised by experts.[9] See, e.g., Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. ——; N. L. R. B. v. Link-Belt Co., supra; cf. Board of Trade v. United States, 314 U.S. 534, 538, 62 S.Ct. 366, 86 L.Ed. ——; Northern Pac. Ry. Co. v. United States, May 25, 1942, 62 S.Ct. 1166, 86 L.Ed. ——; Morgan Stanley Co. v. Securities & Exchange Comm., supra; Perkins v. Endicott Johnson Co., 2 Cir., May 6, 1942, 128 F.2d 208.

Here we have precisely the kind of factual inferences where the specialized judgment of the Board is to be operative according to the Supreme Court. The Board has dealt with scores of cases relating to efforts

to show that dominated unions have become "independent"; it knows the typical pattern of such transformations; it has day-to-day contact with the actualities of labor relations in which it must ascertain whether or not "domination" exists. See N. L. R. B. v. Moench Tanning Co., 2 Cir., 121 F.2d 951, 953.

In B. B. Chemical Co. v. Ellis, 1942, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. ——, the court held that the owner of a method patent, who had improperly authorized manufacturers to use it only with non-patented materials furnished by him, was not entitled to an injunction for infringement of the patent. The patentee advised the Supreme Court that it would forthwith cease its improper conduct and offered to grant unconditional licenses. But the court said, "It will be appropriate to consider petitioner's right to relief when it is able to show that it has fully abandoned its present method of restraining competition in the sale of unpatented articles and that the consequences of the practice have been fully dissipated."[10] In the instant case, it was up to the company to show that "the consequences of" its "practice" maintained for twenty years, and unlawfully for the last three of those years, "[had] been fully dissipated" eleven months after the company announced that it would discontinue them. And it was for the Board to decide, on the evidence, whether that announcement, in the circumstances in which it was made, had that dissipating effect. N. L. R. B. v. Link-Belt Co., supra, 311 U.S. at page 600, 61 S.Ct. 358, 85 L.Ed. 368.

We conclude that there was sufficient evidence to justify the Board in making findings which rejected the company's contentions that the company "had brought home to the employees at large its disavowal" of the dominated union, "its indifference to their future choice," its entire "neutrality" in the matter; that there was no "continued countenance" of that union; that "the slate was wiped clean"; that "every link, real or apparent," between it and the company had been "effectively broken"; that the company had demonstrated that the employees

---

9 While the Supreme Court has at times referred to such agencies or their members as "experts," we respectfully suggest that they are, in truth, specialists advised by experts. See Gellhorn, Federal Administrative Proceedings (1941) 27-29; Perkins v. Endicott Johnson Co., 2 Cir., May 6, 1942, 128 F.2d 208.

10 Emphasis added.

It is of interest that the phrase "completely dissipated * * * the effect" was used by the court, but a short time before, in a Labor Act case. N.L.R.B. v. Link-Belt Co., 1941, 311 U.S. 584, 600, 61 S.Ct. 358, 366, 85 L.Ed. 368.

had "every opportunity * * * to make a free choice of a bargaining representative." We cannot hold that the Board erred in finding that the published disavowal "did not dispel any inference or presumption of company domination or control of the previously dominated union."

6. It may well be that, without more, the Board could properly have concluded that that union was under company domination in June, 1939, when it contracted with the company. But there were further intervening events:

(a) For reasons above stated, we must take it as a fact that after July 20, 1938, despite the publication of the company's disavowal of Independent, "the employees would have just cause to believe" that Independent was still functioning as it had for many years earlier. In that setting, what occurred two days later, on July 22, 1938, is not without importance. On that date, Independent distributed among the employees a pamphlet which stated that the company's stipulation "relates to and concerns only charges filed by the C. I. O. against the Sperry Company, specifically in relation to the now defunct S. H. E. A. * * *"; the pamphlet also stated that the stipulation included a "disavowal by the company of any relationship with" Independent, but went on to say that Independent "is still an organized body and no decision or agreement between the company and the C. I. O. can force us to disband or dissolve * * * You can continue to be represented by a union of Sperry Workers."

It is suggested that that last quoted sentence stated the exact rights of the employees, i.e., that they could be represented by a union consisting of Sperry workers only. But that statement was not made as an abstraction. It must be read in its context. The pamphlet was signed by Independent, and that statement was part of an appeal to stand by Independent. It plainly meant that Independent could be the bargaining representative of the employees in spite of the company's notice, published two days before, that it would not so recognize Independent. As we must accept the Board's finding that, when the pamphlet was distributed, Independent was still company-dominated, it is impossible for us to say that the Board was not warranted in regarding that pamphlet as a further factor bearing on the employees' state of mind when interpreting the disavowal. The Board could properly infer that the employees would believe that the pamphlet had the company's approval, although, in fact, it had given no such approval.

(b) In the light of the Board's findings (which we must accept) that the effect on the employees' minds of the publication, on July 20, 1938, of the company's disavowal of Independent was nullified and that (to use the language of the Supreme Court) "the employees would have just cause to believe" that Independent was still in the same relation to the company as during the twenty years previous, we must consider the following: On April 17, 1939, an agreement was reached between the Board and the company for a consent election with only the C. I. O. union to be on the ballot. The election, held on May 4 and 5, 1939, was lost by the C. I. O. But before then, on or about April 27, the Brotherhood (Independent under a new name) distributed among the employees a sworn statement of its president that he could "assure" them from "evidence * * * in his possession" that "a decisive majority of 'No' votes in the election * * * will result in a contract" between the company and the Brotherhood. Taking as correct the Board's inferences previously noted, we cannot say that the Board could not properly regard this action as having further significance with respect to the state of mind of the employees concerning the company's relations with Brotherhood. It is not for us to say that the Board could not properly infer that the employees might well have believed that the company had given Brotherhood the "assurances" referred to in the affidavit of Brotherhood's president. That, in fact, those assurances had not been given is immaterial in such a case as this. For we note again that the all-important factor, according to the Supreme Court, is the state of mind of the employees. If, as the Board found in effect, the employees had "just cause to believe" that the company's relations with Brotherhood (i.e., Independent, i.e., S. H. E. A.) were the same as they had been for many years, then the employees would have little reason to disbelieve the assurances reported to them under oath by the Brotherhood's chief official. On that basis, the Board cannot be said to be without substantial evidential support in concluding that the election was not free and untrammelled.

7. We now come to a fact much emphasized by the company: Early in May, 1939, a week or ten days after the election, Brotherhood presented to the company cards signed, after the election, by a majority of the employees, stating that they had designated Brotherhood as their collective bargaining agent. The company contends that these facts show a complete disjunction with Independent which was rebaptized as Brotherhood; that a brand new Brotherhood now appeared; and that the company was, consequently, liberated from the obligations of its stipulation not to deal with Independent.

But the company, in so arguing, assumes these facts: (a) that the effect of the disavowal of Independent previously published by the company had not been nullified, and (b) that the election had been unclogged and represented the employees' free choice. Both those assumed facts, however, as we have seen, are negated by the Board's findings and must, therefore, be regarded by us as non-existent. We are, therefore, not called upon to consider what would have been the effect—legally or factually—of the cards signed by the employees, if those assumed facts had existed. We must treat this case as a simple one in which employees designate a company-dominated union as their bargaining representative. The company itself concedes that such a choice by employees in such circumstances[11] is not free and must be disregarded, and that an employer cannot lawfully bargain with a union thus designated.

In May, 1939, after receiving those cards, and a few weeks after the circulation of the affidavit of Brotherhood's president and the election, the company began negotiations with Brotherhood. About a month later, on June 21, 1939, the company signed an exclusive bargaining contract with Brotherhood. On the basis of its other findings, the Board was justified in concluding that that contract was unlawfully made by a labor organization unlawfully dominated by the company.

8. It is argued, however, that this conclusion must be wrong because, in negotiations between the company and Brotherhood, important differences developed. The argument runs that a dominated union would accept without question whatever the employer offered. But there may be "domination," within the meaning of the Act, which does not reach the point of abject servility. The test, according to the Supreme Court, is whether there is "free collective bargaining *free from all taints of an employer's domination * * * or influence.*" International Ass'n of Machinists v. N. L. R. B., supra. A minor may be under his father's influence despite the fact that he may not always accept all his father's dictates. That a client had argued with his lawyer about the size of the lawyer's fees would not compel the conclusion that a contract between them relating to the client's property was not voidable. Proof that there were *some* areas of disagreement between a guardian and ward would not alone dispel the "presumption" that dealings between them were not at arms' length. Negotiations by a union only partially free of employer influence are not what the statute contemplates. It is for the Board, not the courts, to find whether the degree of independence of company influence is sufficient to escape condemnation as constituting domination forbidden by the Act. N. L. R. B. v. Link-Belt Co., supra; cf. Morgan Stanley Co. v. Securities & Exchange Comm., supra; Detroit Edison Co. v. Securities & Exchange Comm., supra.[12]

9. An employee, Ehren, was discharged by the company on September 14, 1939, because he had failed to pay dues to Brotherhood and because the agreement of June, 1939, with Brotherhood provided that employees must be discharged for such nonpayment of dues. Discharge of an employee because he has failed to pay dues to a union

---

[11] Of course, the company does not concede that such were, in fact, the circumstances.

[12] It is suggested that for three years, since June 1939, the Brotherhood has served as a bargaining agent to the satisfaction of a majority of the employees and that the Board's order is unwisely disruptive. But that suggestion begs the basic question, which is whether the employees were free to choose or reject Brotherhood.

Since the Board finds that they were not free, and those findings are supported by the evidence, what we have here is a union company-dominated, which has been the bargaining agent not for three but for twenty-four years. Disruption of such dominated relations is authorized by the Act. The wisdom of that statutory policy is not for the courts to consider.

is the clearest sort of violation of § 8 (3) of the Act, so much so that a proviso had to be included in Section 8 (3) to authorize closed shop agreements; such a discharge can only be justified if it comes within that proviso. But the proviso allows a closed shop agreement only with a union "not established, maintained, or assisted by * * * an unfair labor practice." Since we sustain the Board's findings that Brotherhood was company-dominated, a closed shop agreement with it was a violation of the Act, and a discharge pursuant to that agreement was improper. See Corning Glass Works v. N. L. R. B., 2 Cir., 118 F.2d 625, 629.

■ 10. The breadth of the Board's order is not improper in the circumstances. On the facts as found, it meets the test prescribed in N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. See N. L. R. B. v. Air Associates, 2 Cir., 121 F.2d 586, 592; American Enka Corp. v. N. L. R. B., 4 Cir., 119 F.2d 60; Oughton v. N. L. R. B., 3 Cir., 118 F.2d 486; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874. For the Board's findings show not only a long continued violation of the Act, but a violation after a solemn understanding with the Board that it would discontinue the violation. The Board was, therefore, warranted in concluding that the danger of commission of unfair labor practices was to be anticipated from the company's past conduct. Quotation of the "blanket" clause in full will show that the activities forbidden are very similar to those which have been committed in the past and which the history of the company's labor relations suggests might be expected to recur in the future: "In any other manner interfering with, restraining,

or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in § 7 of the Act [29 U.S.C. A. § 157]."

■ 11. In view of the breach of the stipulation, there can be no question about the validity of that part of the order providing that never again must the company deal with Brotherhood. Nothing is gained and much time and effort is lost by a discussion of the correct definition of "disestablishment." That word occurs nowhere in the Act. One suspects that it is attractive because mouth-filling.[13] We should not be bewitched by it. It is merely a label for the allowable means to achieve enforcement where there has been a violation of § 8 (2) through "domination" or "interference," in which event the Board has broad statutory powers to prevent its continuance. In some cases the Board may consider that posting of a notice of cessation of relations with a previously dominated union is enough; in others, it may consider that it is sufficient if such relations stop for a "breathing spell." In such a case as this the Board may lawfully decide that nothing short of a permanent ban on company dealings with the tainted union will effectuate the enforcement of the Act. The choice of remedies is for the Board. N. L. R. B. v. Link-Belt Co., supra.[14]

We note as an analogy—not controlling but persuasive—the doctrine of those cases in which a court of equity, without relying

---

[13] It has been said that the longest word in our language is "anti-disestablishmentarianistically."

[14] Note the following rulings:
Pittsburgh Plate Glass Co. v. Nat'l Labor Relations Board, 313 U.S. 146, 155, 61 S.Ct. 908, 914, 85 L.Ed. 1251; an order to withdraw recognition construed to "forbid further dealings."
National Labor Relations Board v. Falk Corp., 308 U.S. 453, 460, 461, 462, 60 S.Ct. 307, 84 L.Ed. 396, reversing, 7 Cir., 106 F.2d 454, 456, 457; "complete disestablishment effecting elimination of the Independent as a candidate" (308 U. S. 460, 60 S.Ct. 311, 84 L.Ed. 396); "disestablishing Independent so as to bar it from consideration as an employees' representative" (308 U.S. at pages 461, 462,

60 S.Ct. at page 312, 84 L.Ed. 396); court below erred in modifying notices to inform employees "that Independent, while in terms disestablished for the time being, was still available for selection by the employees." 308 U.S. at page 462, 60 S.Ct. at page 312, 84 L.Ed. 396.
National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219, reversing 4 Cir., 101 F.2d 841, 847, 848; "complete disestablishment of the plan" (308 U.S. at page 250, 60 S.Ct. at page 208, 84 L.Ed. 219); "disestablishment * * * wiping the slate clean" and affording "opportunity to start afresh in organizing" (308 U.S. 250, 60 S.Ct. 208, 84 L.Ed. 219); "complete disestablishment of the existing organization."

on any statute, decrees the sale of assets of a corporation although it is a solvent going concern, because the past and repeated unconscionable conduct of dominating stockholders makes it highly improbable that the improper use of their power will ever cease. See, e.g., Miner v. Bell Isle Ice Co., 93 Mich. 97, 53 N.W. 218, 224, 17 L.R.A. 412; Hornstein, A Remedy for Corporate Abuse, 40 Col.L.Rev. (1940) 220; 14a C.J. 1123, 1124, 19 C.J.S., Corporations, § 1672.

While not essential to our decision as to the scope of the order concerning future relations with Brotherhood, we add the following as pertinent: On the facts as found by the Board and which we must accept as true, the company was dominating Independent on July 20, 1938. Had the Board held a hearing before that date, it could, on July 20, 1938, have entered an order requiring the company to sever its relations with Independent. It did not do so but accepted, instead, a stipulation between it and the company by which the company agreed never to deal with Independent. In Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U. S. 146, 159, 61 S.Ct. 908, 85 L.Ed. 1251, the court assimilated a Board order, made pursuant to a stipulation, to a consent decree; it significantly cited Swift & Co v. United States, 276 U.S. 311, 327, 48 S.Ct. 311, 72 L.Ed. 587, where it was held that a consent decree under the anti-trust statute is a waiver of errors, so that the defendant cannot subsequently complain that the relief granted was broader than could lawfully have been entered under the statute had the defendant objected.[15] It may well be, then, that the Board's order as to relations between the company and Brotherhood (i.e., Independent) can be regarded as authorized by the stipulation. But we are not to be understood as resting our decision on that ground.

A suggestion is made that the Board's order here as to Brotherhood is the result of a general Board policy to discountenance "unaffiliated unions" (i. e., those not affiliated with the major national unions and which draw their entire membership from the employees of one employer only) and that the Board's order therefore means that the company "can never safely deal with any unaffiliated union of its employees." But the records of the Board demonstrate that it has no such policy: From July 1, 1939, to April 30, 1942, the Board has certified an "unaffiliated union" as the bargaining agency in 163 cases.

The prayers of the petitioners, Sperry Gyroscope Company, and Brotherhood, are denied and the petitions denied. The Board's request for enforcement of its order is granted.

SWAN, Circuit Judge (concurring).

I concur in the result solely because the company agreed by the stipulation of July 20, 1938, not to recognize Independent and there was testimony that counsel for Brotherhood admitted: "We are the Independent. We make no bones. We changed the name, that was all, and elected two new officers." As to actual domination of Brotherhood by the company I can find no evidence whatever. The fact that the contract of June 21, 1939, could be successfully negotiated only after the intervention of Mr. Davis, chairman of the New York State Labor Board, is completely persuasive to my mind that there was no domination. Nor is it without significance that upon the charges filed in June and amended in September 1939 the Board declined to issue a complaint, and only after repeated requests for reconsideration finally yielded to the importunities of the local C. I. O. union and filed its complaint on February 19, 1941. This union

---

308 U.S. at page 251, 60 S.Ct. at page 208, 84 L.Ed. 219.

H. J. Heinz Co. v. Nat'l Labor Relations Board, 311 U.S. 514, 522, 61 S.Ct. 320, 323, 85 L.Ed. 309; "disestablishment * * * to remove the obstacle * * * resulting from the continued or renewed recognition of a union."

National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 366, 85 L.Ed. 368; Board may require "order of disestablishment" to insure that "the effect of the unfair labor practice is * * * completely dissipated."

National Labor Relations Board v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867, 870, 871, certiorari denied 310 U.S. 651, 60 S.Ct. 1104, 84 L.Ed. 1416; "the only remedy * * * is complete disestablishment and a new beginning" (108 F.2d at page 870); "only sure course is to disestablish it as the bargaining agency and, entirely dissolving it, begin organization anew." 108 F.2d at page 871.

[15] Cf. Gay v. Parpart, 106 U.S. 679, 699, 1 S.Ct. 456, 27 L.Ed. 256, indicating that a consent decree is a "judicially recorded agreement" of the parties.

had lost in May 1939 an election which the Board certified "was fairly and impartially conducted." I see no evidence of interference by the company with the employees' rights of self-organization. For nearly two years before the Board's complaint was filed, Brotherhood had served as the collective bargaining agent to the apparent satisfaction of a large majority of the employees. To disestablish it now and again bring confusion into the workers' ranks appears to me to effect a perversion of the purposes of the Wagner Act; but, for the reasons stated, I believe this court is powerless to intervene.