**NATIONAL LABOR RELATIONS BOARD v. MEDO PHOTO SUPPLY CORPORATION.**

No. 233.

Circuit Court of Appeals, Second Circuit.

April 28, 1943.

280

Robert B. Watts, Ernest A. Gross, Howard Lichtenstein, Robert Todd McKinlay, and Eugene J. Davidson, all of Washington, D. C., for petitioner.

Seligsberg, Friedman & Berliner, of New York City (William E. Friedman, of New York City, of counsel), for respondent.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

Respondent, in May 1941, had 70 employees; in the latter part of that month, 18 of the 26 employees in its shipping and receiving department signed membership application cards designating a union as their collective bargaining representative. The union thereupon, on May 22, requested respondents to enter into negotiations for a contract and the next day filed a petition with the Board for certification as the exclusive bargaining representative of the employees in that department as an appropriate unit. At a conference on June 4, at the Board's Regional Office, with representatives of respondent, of the union and of the Board present, the union's representative offered to submit proof of the union's majority and to turn the application cards over to a Board representative. The respondent's representative questioned the appropriateness of the unit claimed by the union but told the union's representative that, if they could agree on the unit, respondent would consent to the union's being certified and thereupon the respondent would "automatically go into the process of bargaining." At a meeting on June 5, a representative of respondent said that if the contract proposed by the union con-

stituted a reasonable basis for negotiations, respondent would immediately consent to a certification of the union and begin bargaining, but that meanwhile there would be no purpose in the union's procuring a certification. A conference to negotiate further was set for the succeeding Monday, June 9. Meanwhile, on the intervening Saturday, June 7, 12 of the employees in the shipping and receiving department visited respondent's general manager, and informed him that they and six other members of the union, for whom they were speaking, had no desire to belong to the union if they could obtain a wage-increase. They then presented a proposed wage-scale which was substantially the same as that which the union had demanded. In the morning of Monday, June 9, a committee of four of the employees called on the general manager who informed them that the increase had been granted substantially as requested. The committee reported back to the other employees and then advised the general manager that the employees felt that they did not need the union and "would rather stay out." Later in the same day, the negotiating committee informed the union president that they did not wish the union to represent them any longer, and a representative of the respondent then also stated to the union president that respondent could not negotiate a contract with the union as it understood that the union no longer represented the majority, but also stated that respondent would consent to a holding of an election. The employees' committee then affirmed their renunciation of the union.

The Board found that respondent had waived its objections to the unit; had recognized the union as having been freely designated by a majority of the employees as the exclusive representative of all the employees in the unit; and that respondent was therefore obligated to bargain with the union on behalf of those employees. It also found that, in acting upon the offer of the employees conditioned upon abandonment of the union, the respondent had engaged in an unfair labor practice and that it had improperly refused to bargain collectively with the union. The Board rejected the suggestion that, as some of the employees had been replaced for divers reasons since June 9, 1941, and as the union therefore no longer represented the majority of the employees within the unit, no order should be made

requiring respondent to bargain with the union. On the basis of its findings, the Board entered an order requiring respondent, upon request, to bargain collectively with the union as the exclusive representative of the employees in the unit; to cease and desist from engaging in any like or related acts or conduct; and to post proper notices. The matter is here on petition of the Board to enforce its order.

■ 1. There is substantial evidence to sustain the Board's finding that respondent had recognized the union as the representative of the employees in the department as a proper bargaining unit.

■ 2. There can be no doubt, and respondent in effect concedes, that if it had, of its own accord, made an offer to raise wages on condition of abandonment of the union, it would have been guilty of an unfair labor practice. The question here arises in a case where it has not been proved that the employer initiated the conditional offer. It is unnecessary for us to consider whether, when employees have once selected a bargaining representative, and especially when there has been no certification by the Board or an election, a majority of the employees may then, by informal action, repudiate that representative and bargain directly with the employer. Nor need we consider whether, as an invariable rule, it is an unfair labor practice for an employer to accept an offer made by a majority of the employees to repudiate a representative theretofore selected on condition that the employer will increase wages. It is enough to hold, and we do hold, that it was within the power of the Board to find that, in this particular case, the acceptance of such an offer was an unfair labor practice. In so deciding, we have in mind the doctrine, often stated by the Supreme Court in varying terms, that administrative agencies, because they have been designated by Congress as specialists in a particular field advised by experts, are, within a very wide area, in a better position than a reviewing court to determine the appropriate applications of the statutes which they are directed to administer.[1] We have in mind, too, that the Board, in a particular case, can appropriately take into account the fact that to permit an employer to accept such a conditional offer might render it possible for him to create the appearance of having received such an offer, seemingly made spontaneously by a majority of the employees, when in fact the employer secretly played a part in inducing the offer, for proof of such activity on the part of the employer might be highly difficult to obtain. Many legal rules (both statutory and judge-made) rest upon a recognition of the difficulty of proof of certain kinds of conduct; the rules as to proof in cases of dealings by a trustee with his cestui, a guardian with his ward, and the like, are illustrative; and, under the Act, the position of an employer, in his dealings with his employees, has been treated as somewhat of that character because of the peculiar influence he can exert through the employees' fear of "incurring" his "displeasure."[2]

■ 3. That the union may have lost its majority since the employer refused to bargain does not authorize us to direct a new election; that was a matter for the Board to determine, and it has done so. N. L. R. B. v. P. Lorillard Co., 314 U.S. 512, 513, 62 S.Ct. 397, 86 L.Ed. 380.

The petition of the Board is granted.

L. HAND, Circuit Judge (concurring).

This case comes before us stripped of any intimation of employer control save for the acceptance of the proposal of what I shall assume to have been a majority of the "unit," acting as such, to abandon the union if the employer would raise the

[1] Gray v. Powell, 314 U.S. 402, 413, 62 S.Ct. 326, 86 L.Ed. 301; Alton R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586; International A. of M. v. N. L. R. B., 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; S. E. C. v. Chenery Corp., 63 S.Ct. 454, 87 L.Ed. ——; Perkins v. Endicott Johnson, 2 Cir., 128 F.2d 208, 220-233 and note 60, affirmed, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. ——; Morgan Stanley & Co., Inc., v. S. E. C., 2 Cir., 126 F.2d 325, 332-333; cf. N. L. R. B. v. Moench Tanning Co., 2 Cir., 121 F.2d 951, 953; N. L. R. B. v. Link Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 925; S. E. C. v. Associated Gas & Elec. Co., 2 Cir., 99 F.2d 795, 798.

[2] International A. of M. v. N. L. R. B., 311 U.S. 72, 78, 61 S.Ct. 83, 85 L.Ed. 50; cf. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368; N. L. R. B. v. Federbush, 2 Cir., 121 F.2d 954, 956; N. L. R. B. v. Moench Tanning Co., supra.

wages of the "unit" as a whole. As I understand it, my brothers think that the Board was justified in holding this to be an "unfair labor practice," without passing upon the question whether such an acceptance is ipso facto an unfair practice, even though the employer has had no hand, directly or indirectly, in the proposal. They think that they need not pass upon that question, because in such situations it is practically impossible to be sure that the employer has not in fact been the real promoter of the proposal. Rather than allow undetectible instances to escape in which he has been, the Board may condemn all such agreements, from whomever they may appear to emanate. I will not say that, if the Board had so found, I should not have felt bound to yield to its more intimate acquaintance with the subject matter; certainly it is better placed than we to know how likely it is that in such cases more is meant than meets the eye. But it did not rest its order on such a finding; it held that the employer's acceptance was an "unfair labor practice" as such, quite as much as his proposal would have been, and it seems to me we cannot avoid passing upon that.

If the right of collective bargaining were given only in the interest of the "appropriate unit" concerned, and had no larger public purpose, I should find it very hard to assent to the Board's position. Although 29 U.S.C.A. § 159(a) does indeed say that "representatives designated or selected * * * by the majority * * * shall be the exclusive representatives of all the employees * * * for the purposes of collective bargaining," it would be strong doctrine to hold that in the case of a small group like this, the majority could not be its own representative, for they are certainly the .eventual source of authority to act for the "unit." Moreover, there can be no warrant for saying that the selection of a representative gives him personally any interest which the law need, or indeed should, recognize; his authority is purely derivative and the majority may cancel it as soon as they choose, and resume their power as principal; at least until the Board, as a measure of administrative convenience, sees fit to regulate such substitutions. If the majority have that power, and if they may use it solely in the interest of the "unit," it is hard to find anything to prevent them from agreeing not to bargain through any representative, or not to bargain collectively at all. Any such bargain they might make would by hypothesis be a collective bargain, and would therefore bind the minority; the surrender of the "unit's" right to bargain collectively would be as valid a term of that particular collective bargain as any other term of that, or any other, collective bargain.

Yet scarcely any one would assent to such a doctrine pressed to its conclusion; for the right of collective bargaining was created, not alone in the interest of those employees who on a given occasion may avail themselves of it, but to realize those more pervasive purposes which the preamble of the statute discloses, § 151, 29 U.S.C.A. Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 267–269, 60 S.Ct. 561, 84 L.Ed. 738; National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 362–364, 60 S.Ct. 569, 84 L.Ed. 799; Phelps Dodge Corp v. National Labor Relations Board, 313 U.S. 177, 193–195, 61 S.Ct. 845, 85 L. Ed. 1271, 133 A.L.R. 1217. Not even by the unanimous consent of the "unit" could it permanently surrender its right of collective bargaining: that was created in the interest of industrial peace, and its grant presupposed that it should not be surrendered. Nor could it surrender temporarily that which it could not surrender permanently.

The majority's proposal in the case at bar seems to me to have been in effect a temporary surrender. True, they did not expressly agree not to bargain collectively for any specific or uncertain period; and indeed it would not inevitably follow, because they proposed to abandon the union just formed, that they proposed not to bargain collectively at all. Moreover, I agree that the Board did not base its order upon such a finding, but upon the fact that the majority could not lawfully deal with the employer while they had an elected representative outstanding. Nevertheless, the Board did find that the majority proposed in consideration of a rise in the "unit's" wages to abandon the only union in existence; and, since the plant was otherwise completely "unorganized," it necessarily followed that there would remain no means of collective bargaining, except as the majority continued to act as a bargaining authority. I can find nothing to suggest that the majority meant to do so, the natural inference from what they did

was that the relations between the "unit" and the employer were to remain what they had been: that is, conducted without any authority representing the "unit." That seems to me to be in effect the surrender of collective bargaining, at least for the time being. How long that might be did not appear; but it would have been a breach of faith with the employer for the majority to turn about the next day and organize even an unaffiliated union; for the issue had not been the particular union already formed, but any union at all. While therefore I am not prepared to accept the Board's reasoning, as I understand it, that it was an "unfair labor practice" for the respondent to bargain directly with the majority after it had appointed a representative, I do think that it was an unfair practice so to bargain when the majority's revocation of the union's authority was made conditional upon the closing of a contract in which the majority agreed to abandon collective bargaining even for an unspecified time.